Jo Ann K. Dobransky - 3149
**ARLEO & DONOHUE, L.L.C.**
622 Eagle Rock Avenue
West Orange, New Jersey 07052
(973) 736-8660  Fax (973) 736-1712
Attorneys for Defendant
Certain Underwriters at Lloyd's London
Subscribing to Policy No. ME100504

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CMGK, LLC d/b/a MASSAGE ENVY, a New Jersey Limited Liability Company,<br><br>                    Plaintiff,<br><br>vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NUMBER ME100504 and DOES 1-100,<br><br>                    Defendants. | Civil Action No.:<br><br><br>**NOTICE OF REMOVAL** |

TO:   The Honorable Judges of the
       United States District Court
       For the District of New Jersey

Defendant, Certain Underwriters at Lloyd's London Subscribing to Policy Number ME100504 ("Underwriters"), by and through its attorneys, Arleo & Donohue, LLC, 622 Eagle Rock Avenue, West Orange, NJ 07052, respectfully shows that:

1.      Underwriters is the defendant in the above-entitled action commenced by the above-named plaintiff in the Superior Court of New Jersey, Atlantic County (Docket No. ATL-

L-76-21).  A copy of the Summons and Complaint of which defendant has had notice is attached hereto.  This constitutes all process, pleadings, and orders of which defendant has had notice.

2.      This action is a suit of a civil nature and the amount involved, exclusive of interest and costs, exceeds the sum of $75,000.00.

3.      The United States District Court has diversity jurisdiction over the subject matter of this civil action under 28 U.S.C. §1332(a)(2) in that it is an action wherein the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs and there is complete diversity of citizenship between the plaintiffs and defendants and defendants are residents of foreign countries.

(a)      Plaintiff, CMGK, LLC d/b/a Massage Envy is now, and was at the time of commencement of this action, a Limited Liability Company with a principal place of business at 278 Consumer Square, Mays Landing, New Jersey.  The sole member of CMGK, LLC is E. Gus Khalifa who resides at 7301 East 3rd Avenue, Scottsdale, Arizona and is, therefore, a citizen of Arizona.

(b)      Defendant, Underwriters, is part of an unincorporated foreign insurance market organized under the laws of the United Kingdom and which maintain their principal place of business in London, England.

(c)      Defendant Underwriters is a voluntary association of capital providers known as Lloyd's underwriting members.  The underwriting members of the three Lloyd's syndicates subscribing to Policy No. ME100504 are corporations organized under the laws of the United Kingdom with principal places of business in the United Kingdom.  None of the underwriting members have a principal place of business in the State of New Jersey.

2

(d)     Defendants Does are fictitious defendants whose consent is not required for this removal.

4.     This action is one of which the District Court of the United States has original jurisdiction.

5.     This Notice is being filed within 30 days after Underwriters was served with the Summons and Complaint which took place on January 27, 2021 and the time for filing this Notice under 28 U.S.C. § 1446 has not expired.

6.     This Notice of Removal is being filed within one (1) year of the filing of the State Court action which commenced on January 13, 2021.  See Complaint attached hereto as Exhibit A.

7.     Upon the filing of this Notice, defendant will give written notice thereof to plaintiff's attorney and will file copies of this Notice with the Clerk of the Superior Court, Atlantic County, as provided by law.

8.     There is attached hereto a true and correct copy of all process and pleadings of which defendant has had notice in this action.

**WHEREFORE**, defendant requests that this case be removed from the Superior Court of New Jersey, Atlantic County, to this Court and proceed in this Court as an action properly removed thereto.

ARLEO & DONOHUE, LLC

By: */s/ Jo Ann K. Dobransky*
Jo Ann K. Dobransky

Dated:  February 10, 2021

3

## SUMMONS

Attorney(s) <u>Christopher M. Marrone, Esq. (ID #000342000)</u>

Office Address <u>Lauletta Birnbaum, LLC</u>

Town, State, Zip Code <u>591 Mantua Blvd., Suite 200</u>

<u>Sewell, NJ 08080</u>

Telephone Number <u>856-232-1600</u>

Attorney(s) for Plaintiff <u>CMGK, LLC d/b/a Massage Envy</u>

| |
|---|
| CMGK, LLC d/b/a Massage Envy |
| Plaintiff(s) |
| |
| vs. |
| Certain Underwriters at Lloyd's, London |
| Subscribing to Policy No. ME100504 |
| Defendant(s) |

**Superior Court of
New Jersey**

<u>Atlantic</u> ▾ County

<u>Law</u>      Division

Docket No: <u>ATL-L-76-21</u>

# CIVIL ACTION
# SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

/s/ Michelle M. Smith

Clerk of the Superior Court

DATED: <u>01/13/2021</u>

Name of Defendant to Be Served: <u>Certain Underwriters at Lloyd's London Subscribing Policy No. ME100504</u>

Address of Defendant to Be Served: <u>c/o Katarina Garced, Esq., Mendes & Mount, LP, 750  7th Ave., NY, NY</u>

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**LAULETTA BIRNBAUM, LLC**
*A New Jersey Limited Liability Company*
By:     Christopher M. Marrone, Esq. (I.D. #000342000)
        John C. Eastlack III, Esq. (I.D. No. 282882018)
591 Mantua Boulevard, Suite 200
Sewell, New Jersey 08080
Telephone: (856) 369-3020
Facsimile: (856) 232-1601
*Attorneys for Plaintiff CMGK, LLC d/b/a Massage Envy*

| | |
|---|---|
| CMGK, LLC d/b/a MASSAGE ENVY, a New Jersey Limited Liability Company | SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY LAW DIVISION |
| Plaintiff, | DOCKET NO. |
| v. | Civil Action |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NUMBER ME100504 and DOES 1-100, | **COMPLAINT** |
| Defendants. | |

Plaintiff CMGK, LLC d/b/a Massage Envy ("Envy"), by way of Complaint against Defendant Certain Underwriters at Lloyd's London Subscribing to Policy Number ME100504 and Defendant Does 1-100 (collectively, "Lloyd's"), alleges and states as follows:

## NATURE OF THE ACTION

1.      Under the subject insurance policy, Lloyd's (the insurer) has a duty to defend Envy (the insured) in the event a claim is made against Envy and the claim falls within the policy's scope of coverage. Although certain claims—which are covered under the policy—were made against Envy and timely reported to Lloyd's, Lloyd's disclaimed coverage for these claims. Accordingly, Envy brings this suit for a declaration that these claims fall within the scope of the policy's insuring agreements, and to recover its fees and costs it incurred in defending against these claims.

201734.3

## PARTIES

2.      Envy is a New Jersey limited liability company with a principal place of business at 278 Consumer Square, Mays Landing, New Jersey 08330.

3.      Defendant Certain Underwriters at Lloyd's London Subscribing to Policy Number ME100504 includes those syndicates underwriting out of and companies that operate through the Lloyd's, London insurance market at 1 Lime Street London, United Kingdom participating in the insurance issued to Envy. The syndicates who have subscribed to Policy No. ME100504 are syndicates 510, 4141, and 1880, and Envy sues each of these syndicates individually (collectively, the "Syndicates").

4.      The Syndicates consist of entities or individuals, known as "Names" (a Lloyd's, London term), who have provided the capital necessary to insure Envy under Policy No. ME100504. In other words, a syndicate is a group of Names that subscribe to a certain risk. And each Name who underwrote Policy No. ME100504 is exposed to liability for risks insured by his (or its) respective syndicates. The identity of these Names are unknown to Envy and therefore Envy sues them, individually, as Defendant Does 1-100, fictitious names. Envy will move to amend this complaint when Envy ascertains the true names of Does 1-100.

5.      Upon information and belief, complete diversity of citizenship does not exist between Envy and Does 1-100 because at least one of these defendants is a citizen of New Jersey.

6.      Upon information and belief, defendants, and each of them, were the agents, employees, and/or principals of each of the remaining defendants, and in doing the things hereinafter alleged, each defendant was acting within the course and scope of such agency and

2

201734.3

employment and with the permission and consent, authorization, and ratification of all of their co-defendants.

      7.     Lloyd's[1] has consented to the jurisdiction of this Court, and have agreed to abide by the final decision of this Court or any applicable Appellate Court in the event of an appeal.

<u>**JURISDICTION AND VENUE**</u>

      8.     This Court has personal jurisdiction over Lloyd's and this action for the following reasons: (a) upon information and belief, Lloyd's has been authorized to do business in New Jersey; (b) Lloyd's has agreed to submit to the jurisdiction of the courts in New Jersey with respect to disputes arising from the subject insurance policy; (c) Lloyd's transacts substantial business in the New Jersey; (d) Lloyd's has contracted to insure risks located within New Jersey; (e) the covered claim arose in New Jersey, as set forth in detail below; and (f) Lloyd's has sufficient contacts with New Jersey and this complaint arises out of Lloyd's New Jersey contacts.

      9.     For reasons alleged more fully below, this Court has jurisdiction to grant declaratory relief because an actual controversy exists between the parties.

      10.    Venue is proper in Atlantic County, which, among other things, is the location of Envy's principal place of business.

<u>**FACTS COMMON TO ALL COUNTS**</u>

A.     **The Policy.**

      11.    Lloyd's issued a claims-made professional-liability insurance policy to Envy where Envy agreed to pay a specified premium to Lloyd's, and in exchange, Lloyd's agreed to

---

[1] Throughout this complaint, the term "Lloyd's" shall refer to the Syndicates and Does 1 -100.

201734.3

indemnify and defend Envy against certain claims arising from Envy's massage-therapy services.

12.     Specifically, Lloyd's issued Envy a Specified Medical Professions Professional Liability Insurance Policy under Policy Number ME100504 (the "Policy"). A true and correct copy of the Policy is attached hereto as Exhibit A.

13.     This Policy was effective from March 9, 2018 to March 9, 2019, and the insurance provided under the Policy was subject to a retroactive date of March 9, 2014.

14.     Under the Policy, Lloyd's agreed to pay on behalf of Envy all damages, in excess of the Policy's deductible, that Envy must pay as a consequence of claims made against Envy to which coverage under the Policy applies.

15.     In addition, Lloyd's had the "right and duty to defend" any claim made against Envy to which coverage under the Policy applies.

16.     The Policy names Massage Envy Franchising, LLC and Massage Envy, LLC as additional insureds.

**B.     The Sexual Acts Liability Endorsement.**

17.     Lloyd's issued Envy a Sexual Acts Liability Endorsement (the "Endorsement"), which was attached to the Policy.

18.     Pursuant to the Endorsement, Lloyd's agreed to expand the scope of the Policy's coverage to include certain claims related to sexual acts arising from Envy's message-therapy services.

19.     Specifically, the Endorsement provides:

[Lloyd's] shall pay on behalf of [Envy] all sums in excess of the Deductible amount . . . for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by [Envy] or by any person whose actions [Envy] is legally responsible, or for allegations that [Envy] was negligent in hiring,

4

training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:

A. such Sexual Act arises out of the conduct of [Envy]'s Professional Services; and

B. such Sexual Act is perpetrated or alleged to have been perpetrated during the Policy Period or on or after the Retroactive Date stated in Item 7. of the Declarations and before the end of the Policy Period; and

C. prior to the effective date of this policy, the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy; and

D. the Claim is reported to us by an insured in writing during the Policy Period . . . .

20.     The Endorsement defines a Sexual Act as "sexual abuse, sexual molestation or sexual exploitation arising out of [Envy]'s Professional Services."

21.     The Endorsement defines Sexual Injury as "bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act."

22.     The Policy defines a claim as "a demand received by [Envy] for Damages or services and shall include the service of suit . . . against [Envy]."

23.     Pursuant to the Endorsement, the Policy provides Sexual Act liability coverage for claims involving sexual injury, in the amount of $1,000,000 per claim and $2,000,000 in the aggregate, subject to a $15,000 deductible.

**C.     The Alleged Sexual Act.**

24.     Jane Doe[2] ("Jane"), Envy's former client, alleged that Envy's employee, Steffon Davis, had perpetrated a sexual act against her during a massage session at Envy on September 23, 2017.

---

[2] This individual's name is omitted from this complaint for privacy reasons.

5

25.     Specifically, Jane alleged that Davis, among other things, placed his finger between her vaginal lips and cupped her breast during a massage.

26.     Upon information and belief, Jane reported this incident to the Hamilton Township Police, Atlantic County, on or about September 26, 2017.

27.     Accordingly, the Hamilton Township Police investigated Jane's allegations against Davis, and this investigation included interviewing Jane, Davis, and Envy's then-manager about Doe's allegations.

28.     After the investigation, the Hamilton Township Police chose not to pursue Jane's sexual-assault accusations and closed its investigation into the matter on or about October 12, 2017.

29.     Jane made no further efforts to hold Davis criminally responsible for the alleged sexual act.

**D.      The Lawsuits.**

30.     Almost a year after the alleged sexual act, Jane, among others, filed a complaint against Envy and other defendants, and served this complaint on Envy on September 4, 2018. This action is pending in the New Jersey Superior Court, Law Division, Middlesex County, bearing docket number L-5163-18, and styled as Doe v. Message Envy Franchising, LLC (the "Middlesex Action").

31.     The Court severed Jane's claims in the Middlesex Action by way of a dismissal without prejudice and permitted her to re-file her complaint in Atlantic County.

32.     Accordingly, on January 16, 2020, Jane re-filed her complaint against Envy in the New Jersey Superior Court, Law Division, Atlantic County, bearing docket number L-142-

6

20, and styled as <u>M.N. v. Massage Envy Franchising, LLC</u> (the "Atlantic Action"). A true and correct copy of this complaint is attached hereto as Exhibit B.

33.    In the Actions,[3] Jane has alleged that Davis had perpetrated a sexual act against her during a massage session at Envy on September 23, 2017, and as a result of this alleged sexual act, she, among other things, incurred injuries and damages.

34.    Jane has asserted causes of action against Envy based upon the alleged sexual act for: (1) vicarious liability; (2) negligence; (3) negligent performance of undertaking to render services; (4) negligence per se; (5) negligent infliction of emotional distress; (6) negligent misrepresentation; (7) violation of the New Jersey Consumer Fraud Act; (8) fraudulent concealment; and (9) civil conspiracy.

35.    The day after Envy was served with Jane's initial complaint, Envy reported the claim to Lloyd's on September 5, 2018.

36.    Each claim that Jane asserted against Envy has been properly and timely tendered to Lloyd's according to the Policy, and Envy has demanded Lloyd's to defend and indemnify Envy against all of Jane's causes of action.

**E.    Denial of Coverage.**

37.    Envy, a business run by entrepreneurs, who are neither attorneys nor insurance experts, reasonably believed that Jane's accusations against Davis were unfounded, and that Jane had abandoned her accusations after the Hamilton Township Police closed its investigation.

38.    For example, Hamilton Township Police advised Envy that there was insufficient evidence to pursue Jane's accusations against Davis. Although the police advised

---

[3] Throughout this complaint, the defined term "Actions" refers to the Middlesex and Atlantic Actions.

7

Jane that she still had the opportunity to file a criminal complaint herself against Davis, Jane never did so.

39.     Also, prior to filing the Middlesex Action, Jane never made a demand to Envy for money and never apprised Envy that she intended to file a lawsuit against it.

40.     Moreover, after the police investigation, Jane had no further communications with Envy.

41.     Based on Jane's lack of action and the Hamilton Township's Police's decision not to press charges against Davis, Envy, prior to the Policy's effective date, had no reason to believe that Jane's accusations against Davis may lead to a claim against Envy.

42.     Nevertheless, Lloyd's disclaimed coverage for the Middlesex Action on the grounds that Envy had knowledge of a sexual act which may result in a claim prior to the Policy's effective date, among other reasons. A true and correct copy of Lloyd's letter dated October 23, 2018 to Envy disclaiming coverage for the Middlesex Action in its entirety is attached hereto as Exhibit C.

43.     Accordingly, the parties have genuine differences as to their respective rights and obligations under the Policy.

44.     New Jersey law and the Policy's plain language provide that Lloyd's is obligated to defend and indemnify Envy in the Actions and pay any damages, interest, attorneys' fees, and costs as may be awarded for Lloyd's failure to defend Envy.

45.     Further, Envy had a reasonable expectation of coverage for the causes of action asserted in the Actions.

46.     Envy has paid all premiums due under the Policy and Envy has performed all the terms, conditions, covenants, and obligations imposed on it by the Policy, or by law, other

8

than any terms, conditions, covenants, or obligations that Lloyd's has waived, excused, or is estopped from asserting.

47.     As a result of Lloyd's failure to defend Envy in the Actions, Envy has incurred the burden and expense of defending against the Actions and bringing and prosecuting the instant action.

## COUNT I
### (Declaratory Judgment)

48.     The previous allegations of the Complaint are incorporated fully as if set forth at length herein.

49.     This is an action for declaratory judgment pursuant to the New Jersey Uniform Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62, for the purpose of determining a question in actual controversy between the parties.

50.     A judicial determination and declaration of the rights and obligations of the parties is appropriate at this time so that the parties may ascertain their respective rights and duties under the Policy.

51.     The Policy obligates Lloyd's to pay all sums Envy becomes legally obligated to pay, either through judgment or settlement or as defense fees and costs, in connection with the claims asserted in the Actions.

52.     The parties have genuine differences as to their respective rights and obligations under the Policy, namely, their rights and duties under Section 2 of the Endorsement, which provides in pertinent part:

> [Lloyd's] shall pay on behalf of [Envy] all sums in excess of the Deductible amount . . . for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by [Envy] or by any person whose actions [Envy] is legally responsible, or for allegations that [Envy] was negligent in hiring,

9

training or supervising any Insured person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:

. . . .

C.  prior to the effective date of this policy, the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may result in a Claim under this policy . . . .

53.     Envy is entitled to a declaration that Lloyd's must defend and indemnify Envy in the Actions against Envy according to the Policy and is liable to Envy for any and all defense costs Envy has incurred, and continues to incur, in those actions, including defense costs and attorneys' fees paid or to be paid on behalf of Envy.

54.     Because of the parties' genuine differences as to their rights and duties under the Policy, Envy has suffered and will continue to suffer irreparable harm.

55.     Envy has been prejudiced and will continue to be prejudiced by Lloyd's failure to defend by, among other things, Lloyd's denying Envy the benefits of insurance coverage under which it is required by the Policy and by New Jersey law.

56.     Lloyd's has refused or otherwise failed to perform and indicated that they will continue to refuse or fail to perform, their obligations under the Policy with respect to Actions and any future resolution thereof by judgment or settlement.

57.     As a result, Envy incurred the substantial burden and expense in defending the Actions, as well as the burden and expense of bringing and prosecting this action.

## COUNT II
### (Breach of Contract)

58.     The previous allegations of the Complaint are incorporated as set forth at length herein.

59.     The Policy is a valid and enforceable contract between the parties.

10

201734.3

60.     At all times relevant to this action, Envy has complied with the Policy.

61.     The allegations of the complaints in the Actions are covered by the terms and conditions of the Policy.

62.     Accordingly, Lloyd's had a contractual duty to Envy to undertake the defense of the Actions or otherwise pay for the defense fees and costs incurred by Envy in connection with the defense of those Actions.

63.     Lloyd's has breached that contractual duty by failing to defend Envy in the Actions, and in refusing to reimburse any defense costs Envy has incurred, and continues to incur, in defending the Actions.

64.     As a direct and proximate cause of Lloyd's breach of contract, Envy has incurred damages in amount to be proven at trial, including without limitation attorneys' fees and other costs of defense it has incurred and continues to incur in connection with the Actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Envy demands judgment against Lloyd's as follows:

(1)     Declaring that Lloyd's is obligated to defend Envy in the Actions.

(2)     Declaring that Lloyd's is liable to Envy for all costs, including but not limited to defense costs and attorneys' fees, that Envy has incurred, and continues to incur, in defending the Actions.

(3)     Declaring that Lloyd's is obligated to pay all sums Envy becomes obligated to pay or has paid on account of a judgment or settlement of the Actions.

(4)     Declaring that Lloyd's is liable to Envy for all Envy's incurred attorney's fees and costs in bringing and prosecuting the instant action.

(5)     Awarding Envy its monetary damages in an amount to be proven at trial.

201734.3

(6)   Awarding Envy any and all its incurred attorneys' fees and costs in defending the Actions.

(7)   Awarding Envy any and all its incurred attorneys' fees and costs in bringing and prosecuting the instant action.

(8)   Awarding Envy pre-judgment interest, post-judgment interest, and other interest recoverable under applicable law.

(9)   Granting Envy such other and further relief as the Court deems just and proper.

**LAULETTA BIRNBAUM, LLC**

Dated: January 11, 2021

By:

Christopher M. Marrone, Esq.
John C. Eastlack III, Esq.
591 Mantua Boulevard, Suite 200
Sewell, New Jersey 08080
Telephone: (856) 369-3020
Facsimile:  (856) 232-1601
jeastlack@lauletta.com
*Attorneys for Plaintiff*

12

201734.3

## DESIGNATION FOR TRIAL COUNSEL

Please take notice that Christopher M. Marrone, Esq., is hereby designated as trial counsel in the within action.

## R. 4:5-1 CERTIFICATION

I certify that this dispute is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

## R. 1:38-7 CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to R. 4:10-2(b), demand is made that Lloyd's disclose to Envy's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide Envy's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe, and umbrella policies.

13

201734.3

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable by a jury.

**LAULETTA BIRNBAUM, LLC**

Dated: January 11, 2021

By: _____

Christopher M. Marrone, Esq.

14

201734.3

# Civil Case Information Statement

**Case Details: ATLANTIC | Civil Part Docket# L-000076-21**

**Case Caption:** CMGK, LLC D/B/A MASS AGE ENVY  VS CERTAIN UNDERWR

**Case Initiation Date:** 01/11/2021

**Attorney Name:** JOHN C EASTLACK III

**Firm Name:** LAULETTA BIRNBAUM, LLC

**Address:** 591 MANTUA BLVD STE 200
SEWELL NJ 08080

**Phone:** 8562321600

**Name of Party:** PLAINTIFF : CMGK, LLC d/b/a Massage Envy

**Name of Defendant's Primary Insurance Company** (if known): None

**Case Type:** OTHER INSURANCE CLAIM (INCLUDING DECLARATORY JUDGMENT ACTIONS)

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: CMGK, LLC d/b/a Massage Envy? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

01/11/2021
Dated

/s/ JOHN C EASTLACK III
Signed

Jo Ann K. Dobransky - 017551990
**ARLEO & DONOHUE, L.L.C.**
622 Eagle Rock Avenue
West Orange, New Jersey 07052
(973) 736-8660  Fax (973) 736-1712
Attorneys for Defendant
Certain Underwriters at Lloyd's London
Subscribing to Policy No. ME100504

| | | |
|---|---|---|
| CMGK, LLC d/b/a MASSAGE ENVY, a New Jersey Limited Liability Company<br><br>Plaintiffs,<br><br>vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NUMBER ME100504 and DOES 1-100,<br><br>Defendants. | : : : : : : : : : : : : : : : | SUPERIOR COURT OF NEW JERSEY ATLANTIC COUNTY: LAW DIVISION DOCKET NO.:  ATL-L-76-21<br><br>Civil Action<br><br>**ACKNOWLEDGMENT OF SERVICE** |

Service of the Complaint upon Defendant, Certain Underwriters at Lloyd's London, Subscribing to Policy Number ME100504, is hereby acknowledged this 27th day of January 2021.


ARLEO & DONOHUE, LLC

By:  */s/ Jo Ann K. Dobransky*
       Jo Ann K. Dobransky

Dated:  January 27, 2021

# EXHIBIT  A



# Lloyd's Certificate

**This Insurance** is effected with certain Underwriters at Lloyd's, London.

**This Certificate** is issued in accordance with the limited authorization granted to the Correspondent by certain Underwriters at Lloyd's, London whose syndicate numbers and the proportions underwritten by them can be ascertained from the office of said Correspondent (such Underwriters being hereinafter called "Underwriters") and in consideration of the premium specified herein, Underwriters hereby bind themselves severally and not jointly, each for his own part, and not one for another, their Executors and Administrators.

**The Assured** is requested to read this Certificate, and if it is not correct, return it immediately to the Correspondent for appropriate alteration.

All inquiries regarding this Certificate should be addressed to the following Correspondent:



NAS Insurance Services  CA Lic. #0677191
16501 VENTURA BLVD. SUITE 200 ENCINO, CA 91436

ATL-L-000076-21 01/11/2021 2:37:53 PM Pg 3 of 107 Trans ID: LCV202170903

## CERTIFICATE PROVISIONS

1. **Signature Required.** This certificate shall not be valid unless signed by the Correspondent on the attached Declaration Page.

2. **Correspondent Not Insurer.** The Correspondent is not an Insurer hereunder and neither is nor shall be liable for any loss or claim whatsoever. The Insurers hereunder are those individual Underwriters at Lloyd's, London whose names can be ascertained as hereinbefore set forth.

3. **Cancellation.** If this certificate provides for cancellation and this certificate is cancelled after the inception date earned premium must be paid for the time the insurance has been in force.

4. **Service of Suit.** It is agreed that in the event of the failure of Underwriters to pay any amount claimed to be due hereunder, Underwriters, at the request of any person or entity insured hereunder, will submit to the jurisdiction of any court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be deemed to constitute a waiver of Underwriters' right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court, as permitted by the laws of the United States or of any state, territory, or district in the United States. It is further agreed that service of process in such suit may be made upon the firm or person named on the attached Declaration Page and that in such suit instituted against any one of them upon this Policy, Underwriters will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named party is authorized and directed to accept service on behalf of Underwriters in any such suit upon the request of any person or entity to enter a general appearance on behalf of Underwriters in the event such a suit shall be instituted.

Further, pursuant to the applicable statute of any state, territory or district of the United States, Underwriters shall designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute or any successor in office, as Underwriters' true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate the firm or person named on the attached Declaration Page as the party to whom such officer is authorized to mail such process.

5. **Assignment.** This certificate shall not be assigned either in whole or in part without the written consent of the Correspondent endorsed hereon.

6. **Attached Conditions Incorporated.** This certificate is made and accepted subject to all the provisions, conditions and warranties set forth herein, attached, or endorsed, all of which are to be considered as incorporated herein.

7. **Complaints.** Any questions or concerns regarding services provided under this certificate should be directed to Correspondent, Attn: Compliance Department, 16501 Ventura Boulevard, Suite 200, Encino, CA 91436, (818) 382-2030, compliance@nasinsurance.com

8. **Short Rate Cancellation.** If the attached provisions provide for cancellation, the table below will be used to calculate the short rate proportion of the premium when applicable under the terms of cancellation.

**Short Rate Cancellation Table For Term of One Year**

| Days Insurance in Force | Per Cent of One Year Premium | Days Insurance in Force | Per Cent of One Year Premium | Days Insurance in Force | Per Cent of One Year Premium | Days Insurance in Force | Per Cent of One Year Premium |
|---|---|---|---|---|---|---|---|
| 1 | 5% | 66 – 69 | 29% | 154 – 156 | 53% | 256 – 260 | 77% |
| 2 | 6 | 70 – 73 | 30 | 157 – 160 | 54 | 261 – 264 | 78 |
| 3 – 4 | 7 | 74 – 76 | 31 | 161 – 164 | 55 | 265 – 269 | 79 |
| 5 – 6 | 8 | 77 – 80 | 32 | 165 – 167 | 56 | 270 – 273 | (9 mos.) ....... 80 |
| 7 – 8 | 9 | 81 – 83 | 33 | 168 – 171 | 57 | 274 – 278 | 81 |
| 9 – 10 | 10 | 84 – 87 | 34 | 172 – 175 | 58 | 279 – 282 | 82 |
| 11 – 12 | 11 | 88 – 91 | (3 mos.)........ 35 | 176 – 178 | 59 | 283 – 287 | 83 |
| 13 – 14 | 12 | 92 – 94 | 36 | 179 – 182 | (6 mos.)........ 60 | 288 – 291 | 84 |
| 15 – 16 | 13 | 95 – 98 | 37 | 183 – 187 | 61 | 292 – 296 | 85 |
| 17 – 18 | 14 | 99 – 102 | 38 | 188 – 191 | 62 | 297 – 301 | 86 |
| 19 – 20 | 15 | 103 – 105 | 39 | 192 – 196 | 63 | 302 – 305 | (10 mos.) ....... 87 |
| 21 – 22 | 16 | 106 – 109 | 40 | 197 – 200 | 64 | 306 – 310 | 88 |
| 23 – 25 | 17 | 110 – 113 | 41 | 201 – 205 | 65 | 311 – 314 | 89 |
| 26 – 29 | 18 | 114 – 116 | 42 | 206 – 209 | 66 | 315 – 319 | 90 |
| 30 – 32 | (1 mo.)........ 19 | 117 – 120 | 43 | 210 – 214 | (7 mos.)........ 67 | 320 – 323 | 91 |
| 33 – 36 | 20 | 121 – 124 | (4 mos.) ....... 44 | 215 – 218 | 68 | 324 – 328 | 92 |
| 37 – 40 | 21 | 125 – 127 | 45 | 219 – 223 | 69 | 329 – 332 | 93 |
| 41 – 43 | 22 | 128 – 131 | 46 | 224 – 228 | 70 | 333 – 337 | (11 mos.)........ 94 |
| 44 – 47 | 23 | 132 – 135 | 47 | 229 – 232 | 71 | 338 – 342 | 95 |
| 48 – 51 | 24 | 136 – 138 | 48 | 233 – 237 | 72 | 343 – 346 | 96 |
| 52 – 54 | 25 | 139 – 142 | 49 | 238 – 241 | 73 | 347 – 351 | 97 |
| 55 – 58 | 26 | 143 – 146 | 50 | 242 – 246 | (8 mos.)........ 74 | 352 – 355 | 98 |
| 59 – 62 | (2 mos.) ....... 27 | 147 – 149 | 51 | 247 – 250 | 75 | 356 – 360 | 99 |
| 63 – 65 | 28 | 150 – 153 | (5 mos.) ....... 52 | 251 – 255 | 76 | 361 – 365 | (12 mos.) ..... 100 |

Rules applicable to insurance with terms less than or more than one year:

A.  If insurance has been in force for one year or less, apply the short rate table for annual insurance to the full annual premium determined as for insurance written for a term of one year.

B.  If insurance has been in force for more than one year:
1.  Determine full annual premium as for insurance written for a term of one year.
2.  Deduct such premium from the full insurance premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the insurance has been in force to the length of time beyond one year for which the policy was originally written.
3.  Add premium produced in accordance with items (1) and (2) to obtain earned premium during full period insurance has been in force.

| This Declaration Page is attached to and forms part of certificate provisions (Form SLC-3). | | | | |
|---|---|---|---|---|
| Previous No. | NEW | Authority Ref. No. | B6089PRW181861 | Certificate No. |
| | | | | **ME100504** |

**SPECIFIED MEDICAL PROFESSIONS**
**PROFESSIONAL LIABILITY COVERAGE FORM**
**CLAIMS MADE AND REPORTED COVERAGE WITH ERODING LIMITS**

1. **NAMED INSURED:** CMGK, LLC dba: Massage Envy

2. **NAMED INSURED'S ADDRESS:** 278 Consumer Sq.
Mays Landing, NJ 08330

3. **POLICY PERIOD:**

   From: March 9, 2018 to March 9, 2019 both days at 12:01 A.M. Local Standard Time at the **Named Insured's** address shown in Item 2 above.

4. **PROFESSIONAL SERVICES:** Massage Therapy and Aesthetics Services

5. **LIMIT OF LIABILITY:**

   Each **Claim:** $2,000,000.00
   Policy Aggregate Limit of Liability: $4,000,000.00

6. **DEDUCTIBLE:** $2,500.00 Each **Claim**

7. **RETROACTIVE DATE:** March 9, 2014

8. **RATE:** Flat
   **PREMIUM BASE:** Flat

9. **PREMIUM FOR THIS COVERAGE:** $5,175.00

10. **PREMIUM FOR EXTENDED REPORTING PERIOD:** 100% for 12 months; 150% for 24 months; or 200% for 36 months

11. **The Insured is not a proprietor, superintendent, Executive, officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise not named in Item 1. hereinabove, except as follows:** None

12. **FORMS AND ENDORSEMENTS ATTACHED AT INCEPTION: See Schedule of Forms PL DEC 06-17**
    Wherever in any of the forms, clauses or conditions of this insurance the word "Policy" appears, this shall be deemed to be "Certificate".
    Insurance is effected with certain UNDERWRITERS AT LLOYD'S, LONDON (100%)

13. **NOTIFICATION OF CLAIM TO:** NAS Insurance Services, LLC
    16501 Ventura Blvd., Suite 200
    Encino, CA 91436
    (888) 627-8995
    claims@nasinsurance.com

14. **SERVICE OF SUIT:** FLWA Service Corp.
    c/o Foley & Lardner LLP
    555 California Street, Suite 1700
    San Francisco, CA 94104-1520

**Dated** May 1, 2018 **NAS INSURANCE SERVICES, LLC**

By: _____
Correspondent

D1861MEPL-0617 Page 1 of 1

CMGK, LLC dba: Massage Envy
Policy No: ME100504

# PROFESSIONAL LIABILITY SCHEDULE OF FORMS

| | |
|---|---|
| D1861MEPL-0617 | Specified Medical Professions Professional Liability Coverage Declaration Page |
| P1861MEPL-0617 | Specified Medical Professions Professional Liability Coverage Form |
| | Application form dated March 15, 2018. |
| E1861A-0914 | Nuclear Energy Liability Exclusion (Broad) Endorsement |
| E1861B-0914 | War and Civil War Exclusion Clause Endorsement |
| E1861US-0315 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| E1861MEC-0617 | 25% Minimum Earned Premium Endorsement |
| E1861MED-0617 | Additional Insured Endorsement |
| E1861MEE-0617 | Amendment of Definitions and Exclusions – Electronic Data and Distribution of Material in Violation of Statutes Endorsement |
| E1861MEG-0617 | Defense of License Coverage Endorsement |
| E1861MEH-0617 | Offsite Event Activity Amendatory Endorsement |
| E1861MEJ-0617 | Restriction of Coverage – Scheduled Location(s) Endorsement |
| E1861MEK-0617 | Sexual Acts Liability Endorsement |
| E1861MEM-0617 | Termination Endorsement |
| E1861MEN-0617 | War and Terrorism Exclusion Endorsement |
| E1861MEQ-0617 | Stretching Endorsement |
| E1861MER-0717 | e-MD Endorsement |

# Specified Medical Professions Professional Liability Insurance Policy

THIS IS A CLAIMS MADE AND REPORTED POLICY, PLEASE READ IT CAREFULLY.

Coverage applies only to **Claims** first made against an Insured and reported to the Company during the **Policy Period**, or if applicable, during the Extended Reporting Period.  **Claim Expenses** and **Damages** shall reduce and may exhaust the applicable Limit of Liability and shall be subject to the Deductible.

As used in this policy, the words "the Company" refer to the Underwriters providing this insurance.

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted by or on behalf of the Named Insured, and subject to the terms, conditions and limitation of this policy, the Company and the Named Insured agree as follows:

## THE INSURED

The unqualified word "Insured", either in the singular or plural, means:

A.  the Named Insured specified in Item 1. of the Declarations;

B.  any principal, partner, officer, director, employee, **Volunteer Worker** or any former principal, partner, officer, director, employee, or **Volunteer Worker** of the Named Insured, solely while acting on behalf of the Named Insured and within the scope of his/her duties as such; provided, however, this insurance shall not apply to any **Claim** made against any Insured who is a physician, surgeon or dentist arising out of the rendering of or failure to render **Professional Services** in his/her capacity as a physician, surgeon or dentist;

C.  if the Named Insured specified in Item 1. of the Declarations is a limited liability company, any manager thereof or any past member thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of the limited liability company and any member thereof or any past member thereof, but only with respect to the conduct of the business of the limited liability company;

D.  any medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her **Administrative Duties** as such; provided, however, this insurance shall not apply to any **Claim** made against any medical director who is a physician, surgeon or dentist arising out of the rendering of or failure to render **Professional Services** in his/her capacity as a physician, surgeon or dentist;

E.  any student enrolled in a training program in connection with the Named Insured's **Professional Services** solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

F.  the heirs, executors, administrators, assigns and legal representatives of each Insured in the event of death, incapacity or bankruptcy of such Insured, but only while acting within the scope of their duties as such on behalf of the Named Insured or of an Insured's estate.

## INSURING AGREEMENT

The Company shall pay on behalf of an Insured all sums in excess of the Deductible amount stated in Item 6. of the Declarations, which the Insured shall become legally obligated to pay as **Damages** as a result of **Claims** first made against the Insured during the **Policy Period** or during the Extended Reporting Period, if exercised, for **Professional Personal Injury** by reason of any act, error or omission in **Professional Services** rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's **Professional Services** provided:

A.  such act, error or omission happens on or after the Retroactive Date stated in Item 7. of the Declarations and before the end of the **Policy Period**; and

B.  prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may result in a **Claim** under this policy; and

C.    the **Claim** is reported to us by an Insured in writing during the **Policy Period** or during the Extended Reporting Period, if applicable.

Our right and duty to defend any **Claim** ends when we have used up the applicable limit of insurance by payment of any **Damages** and/or **Claim Expenses**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for by this Policy.

# DEFINITIONS

A.    **Administrative Duties** means establishing medical protocol, serving on a standards review, peer review, or credentialing committee or similar professional board or committee of the Named Insured; provided, however, **Administrative Duties** shall not include:

1.  rendering or failure to render to a patient, person or resident of a healthcare facility **Professional Services** by a medical director which results in **Professional Personal Injury**; or

2.  rendering or failure to render patient specific medical direction via telecommunications to other healthcare professionals.

B.    **Claim** means a demand received by an Insured for **Damages** or services and shall include the service of suit or institution of arbitration proceedings against an Insured.

C.    **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by an Insured with the prior written consent of the Company in the defense of that portion of any **Claim** for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, **Claim Expenses** shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

D.    **Damages** means the monetary portion of any judgment, award or settlement; provided, however, **Damages** shall not include: (1) punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including treble damages; (2) taxes, criminal or civil fines, or penalties imposed by law; (3) sanctions; (4) matters which are uninsurable under the law pursuant to which this policy shall be construed; or (5) the return of or restitution of fees, profits or charges for services rendered.

E.    **Professional Personal Injury** means:

1.  any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any patient, person or resident of a healthcare facility receiving **Professional Services**;

2.  false arrest, detention or imprisonment, or malicious prosecution except when inflicted by, at the direction of, or with the consent or acquiescence of an Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification; or

3.  the publication or utterance of a libel or slander or a publication or an utterance in violation of a patient's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of an Insured who has predetermined to commit such act, or allowed such act to have been committed, without legal justification.

F.    **Professional Services** means those services described in Item 4. of the Declarations.

G.   **Policy Period** means the period from the inception date of this policy to the policy expiration date as stated in Item 3. of the Declarations, or its earlier cancellation or termination date.

H.   **Volunteer Worker** means any person who is not an employee of the Named Insured and who donates his/ her work at the direction and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

This policy does not apply to:

A.   any **Claim** based upon or arising out of any dishonest, fraudulent, criminal, malicious or knowingly wrongful acts, errors or omissions intentionally committed by or at the direction of an Insured;

B.   liability arising out of an Insured's activities in his/her capacity as proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, business enterprise, or any governmental body, sub-division or agency not named as an Insured under this policy unless such activities are disclosed in the application and listed in Item 11. of the Declarations;

C.   any **Claim** based upon or arising out of any obligation of an Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law;

D.   **Professional Personal Injury** to, or sickness, disease or death of, any employee of an Insured arising out of, and in the course of his/her employment by the Insured;

E.   any **Claim** based upon or arising out of any liability assumed by an Insured in a contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of the contract or agreement;

F.   any **Claim** based upon or arising out of any unlawful discrimination by any Insured;

G.   injury arising out of the performance of a criminal act or caused by a person while under the influence of intoxicants or narcotics;

H.   liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

I.   any **Claim** based upon or arising out of any sexual act, including without limitation, sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature; provided, however, the Company shall defend the Named Insured for such a **Claim** strictly for the vicarious liability of the Named Insured, unless a manager, supervisor, officer, director, trustee or partner of the Named Insured:

    1.   knew or should have known about the sexual act allegedly committed by an Insured but failed to prevent or stop it; or

    2.   knew or should have known that the Insured who allegedly committed the sexual act had a prior history of such sexual misconduct act;

The Company shall not pay **Damages** on behalf of the Named Insured for such a **Claim**.

J.   any **Claim** arising out of general liability or products liability;

K.   any **Claim** made against an Insured:

    1.   by any person or organization or its subrogee, assignee, contractor, subcontractor, or parent company, subsidiary, division or affiliated company which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by an Insured or parent company or any subsidiary, division or affiliated organization; or

    2.   by or on behalf of any Insured under this policy; provided, however, this exclusion shall not apply to any **Claim** made against any Insured arising out of the rendering of or failure to

render **Professional Services** by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, if such Insured is a patient or client of the Insured;

L.  any **Claim** based upon or arising out of any employment dispute;

M.  any **Claim** based upon or arising out of a warranty or guarantee of cure or success of treatment which is alleged to have arisen out of advertisement;

N.  any **Claim** based upon or arising out of the dispensing of or the use of any drug or device whose approval for use was withdrawn by the Food and Drug Administration (FDA) at the time such drug or device was used or dispensed;

O.  any **Claim** based upon or arising out of any actual or alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto or any similar federal, state or local law; or

P.  any **Claim** based upon or arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C., Section 1961, et seq.

## TERRITORY

The insurance afforded by this policy applies worldwide, provided the **Claim** is made in the United States of America, its territories or possessions, or Puerto Rico.

## LIMITS OF LIABILITY

A.  **Limit of Liability-Each Claim:** The total liability of the Company for the combined total of **Damages** and **Claim Expenses** for each **Claim** first made and reported during the **Policy Period** or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in Item 5. of the Declarations as applicable to Each **Claim**.

B.  **Limit of Liability - Policy Aggregate:** Subject to Limits of Liability, A. **Limit of Liability-Each Claim**, above, the total liability of the Company shall not exceed the Policy Aggregate Limit of Liability stated in Item 5. of the Declarations for all **Damages** and **Claim Expenses** arising out of all **Claim**s first made and reported during the **Policy Period** and the Extended Reporting Period, if exercised.

C.  **Limit of Liability - Reduction for Refusal to Settle:** The Company shall not settle any **Claim** without the consent of an Insured. However, if an Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, an Insured refuses to consent to any settlement recommended by the Company and shall elect to contest the **Claim** or continue any legal proceedings in connection with such **Claim**, then the Company's liability for the **Claim** shall not exceed the amount for which the **Claim** could have been so settled including **Claim Expenses** incurred up to the date of such refusal. Such amounts are subject to the provisions of Limits of Liability, A. **Limit of Liability-Each Claim** and B. **Limit of Liability - Policy Aggregate**.

D.  **Deductible:** The Deductible amount stated in Item 6. of the Declarations shall be paid by the Named Insured and shall be applicable to each **Claim** and shall include **Damages** and **Claim Expenses**, whether or not **Damages** payments are made.

   Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each **Claim** shall not exceed the Deductible amount stated in Item 6. of the Declarations.

   The determination of the Company as to the reasonableness of the **Claim Expenses** shall be conclusive on the Named Insured.

E.  **Multiple Insureds, Claims and Claimants:** The inclusion herein of more than one Insured in any **Claim** or suit or the making of **Claim**s or the bringing of suits by more than one person or organization

shall not operate to increase the Limits of Liability stated in Item 5. of the Declarations. More than one **Claim** arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single **Claim**. All such **Claims**, whenever made, shall be treated as a single **Claim**. Such single **Claim**, whenever made, shall be deemed to be first made on the date on which the earliest **Claim** arising out of such act, error or omission is made.  With regard to notice given to and accepted by the Company pursuant to Section Claims, B. **Discovery Clause**, such notice shall be deemed to be first reported on the date within the **Policy Period** on which such notice of potential **Claim** is first received by the Company, if and only if such notice is made during the applicable notice requirements of the Policy.

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

The Company shall have the right and duty to defend and investigate any **Claim** to which coverage under this policy applies. Subject to Section Limits of Liability, C. **Limit of Liability - Reduction for Refusal to Settle**, the Company may make such investigation and settlement of any **Claim** as it deems expedient. **Claim Expenses** incurred in defending and investigating a **Claim** shall be a part of and shall not be in addition to the applicable Limits of Liability stated in Item 5. of the Declarations. Such **Claim Expenses** shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any **Damages** or to defend or to continue to defend any **Claim** or to pay **Claim Expenses** for **Claim**s after the applicable Limit or Limits of Liability stated in Item 5. of the Declarations have been exhausted.

## CLAIMS

A.   **Claim Reporting Provision:** The Insured shall give to the Company, through the representatives named in Item 13. of the Declarations, written notice as soon as practicable of any **Claim** first made against an Insured during the **Policy Period** or the Extended Reporting Period, if exercised.

In the event suit is brought against an Insured, the Insured shall immediately forward to the representatives named in Item 13. of the Declarations, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

B.   **Discovery Clause:** If during the **Policy Period**, an Insured first becomes aware of a specific act, error or omission in **Professional Services** which may result in a **Claim** within the scope of coverage of this policy, then the Insured may provide to the Company, through the representatives named in Item 13. of the Declarations, written notice containing the information listed below. If such written notice is received by the Company during the **Policy Period**, then any **Claim** subsequently made against the Insured arising out of such act, error or omission in **Professional Services** shall be deemed, for this insurance, to have been made on the date on which such written notice is received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1.   the description of the specific act, error or omission;

2.   the date on which such act, error or omission took place;

3.   the injury or damage which has or may result from such act, error or omission;

4.   the identity of any injured persons; and

5.   the circumstances by which the Insured first became aware of such act, error or omission.

C.   **Assistance and Cooperation of the Insured:** The Insureds shall cooperate with the Company and upon the Company's request, the Insureds shall: (1) submit to examination and interview by a representative of the Company, under oath if required; (2) attend hearings, depositions and trials; (3) assist in effecting settlement, securing and giving evidence, and obtaining the attendance of witnesses in the conduct of suits; (4) give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any **Claim**, all without cost to the Company. The Insureds shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insureds may have. The Insureds shall not, except at their own cost, make

any payment, admit any liability, settle any **Claims**, assume any obligation or incur any expense without the written consent of the Company.

D.    **False or Fraudulent Claims:** If any Insured shall commit fraud in proffering any **Claim**, this insurance shall become void as to such Insured from the date such fraudulent **Claim** is proffered.

# EXTENDED REPORTING PERIOD

A.    If the Named Insured non-renews this policy or cancels this policy pursuant to Section Other Conditions A. **Cancellation**, or if the Company non-renews this policy or cancels this policy pursuant to Section Other Conditions A. **Cancellation**, for reasons other than nonpayment of premium or Deductible or noncompliance with the terms and conditions of this policy, then the Named Insured shall have the right, upon payment of an additional premium calculated at the percentage stated in Item 10. of the Declarations of the annual premium for the policy, to extend the coverage granted under this policy for **Claims** first made against an Insured during the period of months stated in Item 10. of the Declarations (as elected by the Named Insured), and reported to the Company pursuant to Section Claims A. **Claim Reporting Provision**, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission in **Professional Services** rendered on or after the Retroactive Date and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this policy. This period of months as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims-made insurance coverage on which the Retroactive Date is the same as or earlier than that stated in the Item 7. of the Declarations, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or Deductible and/or Limit of Liability for renewal does not constitute a cancellation or refusal to renew for purposes of this provision.

This Extended Reporting Period shall not be available when any Insured's license or right to practice his/her profession is revoked, suspended or surrendered.

B.    As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid: (1) all Deductibles when due; (2) all premiums due for the **Policy Period**; and (3) all premium due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement.

The right to purchase the Extended Reporting Period shall terminate unless a written notice of such election for the Extended Reporting Period is received by the Company, through the representatives named in Item 13. of the Declarations, within thirty (30) days after the effective date of cancellation or nonrenewal, together with payment of the additional premium for the Extended Reporting Period. If such written notice of election and payment of additional premium are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

C.    In the event of the purchase of the Extended Reporting Period, the entire premium therefor shall be fully earned at its commencement.

D.    The Extended Reporting Period shall not in any way increase the Limits of Liability stated in Item 5. of the Declarations.

# OTHER CONDITIONS

A.    **Cancellation:** This policy may be cancelled by the Named Insured on behalf of all Insureds by mailing to the Company, through the representatives named in Item 13. of the Declarations, written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the earned premium shall be computed at the customary short rate. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

This policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing to the Named Insured, at the address stated in Item 2. of the Declarations, written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be

effective. However, if the policy is cancelled because the Named Insured has failed to pay a premium or Deductible when due, including premium due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement, this policy may be cancelled by the Company or by its underwriting manager, on behalf of the Company, by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective.

The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured, the Company or its underwriting manager shall be equivalent to mailing. If cancelled by the Company, any earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

B.    **Representations:** By acceptance of this policy, the Insureds agree as follows:

     1.    that the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

     2.    that the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

C.    **Entire Agreement:** This policy, the Declarations, the application(s) and any written endorsements attached hereto shall be deemed to be a single unitary contract.

D.    **Other Insurance:** This insurance shall be excess of the Deductible stated in Item 6. of the Declarations and any other valid and collectible insurance available to an Insured, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy.

E.    **Changes:** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this policy and shall not estop the Company from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the Insureds and the Company or any of its agents relating to this insurance.

F.    **Assignment of Interest:** Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.

G.    **Subrogation:** In the event of any payment under this policy, the Company shall be subrogated to the right of recovery of all Insureds to the extent of such payment. The Insureds shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insureds shall do nothing after the **Claim** to prejudice such rights.

The Company shall not exercise any such rights against any person, firms or corporations included in the definition of Insured. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an Insured in respect of any **Claim** brought about or contributed to by the intentional, dishonest, fraudulent, criminal or malicious act or omission of such Insured.

Any amount so recovered shall be apportioned as follows:

Any recovery shall first be used for the repayment of expenses incurred toward subrogation; second, to any loss and expense payment by the Insured in excess of any Deductible(s); third, to any loss and expense payments by any excess carrier on behalf of the Insured; fourth, to any loss and expense payments by any primary carrier on behalf of the Insured; and, last, to repayment of the Insured's Deductible.

H.    **Inspection:** The Company shall be permitted but not obligated to inspect any Insured's operations at any time. Neither the Company's right to make inspections, nor the making thereof, nor any report

thereon shall constitute an undertaking on behalf of or for the benefit of the Insureds or others, to determine or warrant that such operations are safe or healthful, or are in compliance with any law, rule or regulation.

I.   **Action Against the Company:** No action shall lie against the Company unless, as a condition precedent thereto, the Insureds shall have fully complied with all the terms of this policy, nor until the amount of any Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the Claimant and the Company.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against an Insured to determine the Insured's liability. Bankruptcy or insolvency of an Insured or of an Insured's estate shall not relieve the Company of any of its obligations hereunder.

J.   **Authorization:** By acceptance of this policy, the first person or organization named in Item 1. of the Declarations shall act on behalf of all Insureds with respect to the giving and receiving of all notices to and from the Company as provided herein: the exercising of the Extended Reporting Period; the cancellation of this policy in whole or part; the payment of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the Insureds agree that such person or organization shall act on their behalf.

K.   **Service of Suit:** Except with respect to any policy issued in any state in which the Company is licensed as an admitted insurer to transact business, it is agreed that, if the Company fails to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon the Company's representative designated in Item 14 of the Declarations, and that in any suit instituted against the Company upon this contract, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the Company's representatives named in Item 14 of the Declarations to whom said officer is authorized to mail such process or a true copy thereof.

**NAS Insurance Services, LLC**

By: _____

**On behalf of the Underwriters providing this insurance.**

## NUCLEAR ENERGY LIABILITY EXCLUSION (BROAD FORM) – E1861A-0914

It is agreed that:

1. This policy does not apply:

  A. Under any Liability Coverage, to bodily injury or property damage.

    1. with respect to which an Insured under the policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    2. resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

  B. Under any Medical Payments Coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

  C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

    1. the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (b) has been discharged or dispersed therefrom;

    2. the nuclear material is contained in spent fuel or waste at any time possessed, handle, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

    3. the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion, (3) applies only to property damage to such nuclear facility and any property thereof.

As used in this Endorsement:

  "hazardous properties" include radioactive, toxic or explosive properties;

  "nuclear material" means source material, special nuclear material or byproduct material;

  "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof;

  "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

  "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

---

**All other terms and condition of the Policy remain unchanged.**

"nuclear facility" means

    a.   any nuclear reactor,

    b.   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

    c.   any equipment or device designed or used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    d.   any structure, basin excavation, premises or place prepared or used for the storage or disposal of waste.

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operation;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018    Expiration:    March 9, 2019 |
| Endorsement No.: | 1 |

**All other terms and condition of the Policy remain unchanged.**

## WAR AND CIVIL WAR EXCLUSION CLAUSE – E1861B-0914

Notwithstanding anything to the contrary contained herein this Policy does not cover loss or damage directly or indirectly occasioned by, happening through or in consequence of:

1.    War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power; or

2.    Confiscation, nationalization, requisition, destruction of, or damage to property by or under the order of any government or public or local authority.

1/1/38
NMA464

This endorsement is to take effect on March 9, 2018.

Policy No.:              ME100504

Name:                   CMGK, LLC dba: Massage Envy

Policy Effective Date:    March 9, 2018          Expiration:    March 9, 2019

Endorsement No.:         2

**All other terms and condition of the Policy remain unchanged.**

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL (OFAC) ADVISORY NOTICE TO POLICYHOLDERS – E1861US-0315

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your Policy.   You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the Office of Foreign Assets Control ("OFAC").   **Please read this Notice carefully**.

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

1.     Foreign agents;
2.     Front organizations;
3.     Terrorists;
4.     Terrorist organizations; and
5.     Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons".   This list can be located on the United States Treasury's website -- http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it determined that you or any other insured, or any person or entity claiming the benefits of this insurance, has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC.   When an insurance policy is considered to be such a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018          Expiration:     March 9, 2019 |
| Endorsement No.: | 3 |

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### 25% MINIMUM EARNED PREMIUM – E1861MEC-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that in the event this Policy is cancelled by the Named Insured, the policy premium is subject to a minimum earned premium of twenty-five percent (25%) of the total premium.

All other terms and conditions of the policy shall remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018     Expiration:    March 9, 2019 |
| Endorsement No.: | 4 |

**All other terms and conditions of the Policy remain unchanged.**

E1861MEC-0617                                       Page 1 of 1

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### ADDITIONAL INSURED – E1861MED-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the Policy is amended as follows:

1.  Section "The Insured" is amended by the addition of the following:

    Whenever used in this policy, the unqualified word "Insured" shall also mean any **Additional Insured**.

    **Additional Insured** means, whenever used in this endorsement, the following:

    1.  Massage Envy Franchising, LLC
    2.  Massage Envy, LLC

    Coverage provided to any **Additional Insured** as defined herein shall apply solely with respect to any **Claim** arising from **Professional Services** rendered by the Named Insured specified in Item 1. of the Declarations.

2.  Section "Defense, Settlements and Claim Expenses" is amended by the addition of the following:

    The Company's obligation to provide defense shall not be severable with respect to the Named Insured and any **Additional Insured**.

3.  The **Additional Insured** and the Named Insured shall be represented by the same lawyer unless such mutual representation is prohibited by law or by any applicable professional code of conduct.

4.  This insurance shall be excess and non-contributory insurance over any other insurance afforded to the **Additional Insured**.

All other provisions of the policy shall remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018          Expiration:    March 9, 2019 |
| Endorsement No.: | 5 |

---

**All other terms and conditions of the Policy remain unchanged.**

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

**SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT**

**AMENDMENT OF DEFINITIONS AND EXCLUSIONS – ELECTRONIC DATA AND DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES – E1861MEE-0617**

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

Section "The Exclusions" is amended by the addition of the following:

This policy does not apply to any **Claim** based upon or arising out of any violation of:

(a) the Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

(b) the CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation; or

(c) any other statute, law, rule, ordinance or regulation that prohibits or limits the sending, transmitting, communication or distribution of information or other material.

All other terms and conditions remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018 |
| Expiration: | March 9, 2019 |
| Endorsement No.: | 6 |

***THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.***

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### DEFENSE OF LICENSE COVERAGE – E1861MEG-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

I.     Subject to all policy exclusions, terms and conditions, this endorsement shall provide for payment of all legal fees and legal expenses incurred in the defense of the following types of disciplinary proceedings against an Insured, provided that the first notice of such proceeding to the Insured is made during the effective dates of this endorsement, and that such proceeding is reported to the Company during the effective dates of this endorsement:

   (a)    any state or federal regulatory or disciplinary action, inquiry or review involving the Insured's professional licensure, with the purpose of adversely affecting the Insured's license;

   (b)    any professional disciplinary action, inquiry, or review taken against the Insured by any health care entity which affects the Insured's professional privileges or membership with such entity, but this shall not include any disputes involving timely completion of medical records or any application for initial placement on a medical staff.

   This coverage shall not apply to any criminal proceeding or to any other legal or civil matters or proceedings; nor shall it apply to any circumstance or event which any Insured was aware of prior to the effective date of this coverage, nor shall it apply in any way to any disputes involving allegations of fraud or willful non-compliance with Medicare/Medicaid regulations or procedures.

II.    The Company shall select and pay for legal counsel for the defense of covered proceedings. The Company shall have the final decision as to the reasonableness of fees and expenses. Legal fees and legal expenses are defined as 1) attorney's fees charged by legal counsel selected by the Company, 2) expert witness fees, and 3) related legal and/or associated investigation costs and expenses. Legal fees and legal expenses do not include any Insured's salary or loss of other billing or income, nor any expenses incurred by an Insured without consent of the Company.

III.   The Company shall have the final decision as to the appeal of any such covered proceeding concluded against an Insured.

IV.    <u>LIMITS OF DEFENSE COSTS</u>

   The limits of this coverage are a per massage therapist limit and no deductible shall apply. Further, in the case of an Insured Group, a massage therapist can only obtain this coverage as long as he/she is a member of the Insured Group.

|  |  |
|---|---|
| LIMITS OF DEFENSE COSTS | $2,500.00 per disciplinary proceeding/$10,000.00 aggregate |
| DEDUCTIBLE | None |

V.     <u>EXTENDED REPORTING PERIOD</u>

   No Defense of License Coverage shall be offered in conjunction with the Named Insured's purchase or election of any Extended Reporting Period (ERP).

***All other terms and conditions of the Policy remain unchanged.***

All other provisions of the policy shall apply and remain unchanged.

This endorsement is to take effect on March 9, 2018.

Policy No.:                          ME100504

Name:                               CMGK, LLC dba: Massage Envy

Policy Effective Date:      March 9, 2018          Expiration:      March 9, 2019

Endorsement No.:            7

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### OFFSITE EVENT ACTIVITY AMENDATORY – E1861MEH-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.  Section "Insuring Agreement" is amended by the addition of the following:

    The Company shall bear on behalf of an Insured all sums in excess of the Deductible amount stated in Item 6. of the Declarations and up to the Limit of Liability, which the Insured shall become legally obligated to pay as **Damages** as a result of **Claims** first made against the Insured during the **Policy Period** or during the Extended Reporting Period, if exercised, for acts, errors or omissions arising from an **Offsite Event Activity** performed by an Insured on behalf of the Named Insured specified in Item 1 of the Declarations.

2.  Section "The Insured" is amended by the addition of the following:

    For an **Offsite Event** at which an Insured performs an **Offsite Event Activity**, **Additional Insured** shall be defined to include the owner of the location at which the **Offsite Event** is taking place. Coverage provided to any **Additional Insured** as defined herein shall apply solely with respect to any **Claim** arising from an **Offsite Event Activity** performed by an Insured on behalf of the Named Insured specified in Item 1 of the Declarations.

3.  Section "Definitions" is amended by the addition of the following:

    **Offsite Event** is defined to include, but not be limited to, charity functions, fun runs, farmers markets, bridal shows, health fairs, job fairs and grand openings.

    **Offsite Event Activity** means handing out fliers, chair massages, eyebrow waxing, or test waxing (to be conducted on the arm) at an **Offsite Event**.

4.  Section "Defense, Settlement and Claim Expenses" is amended by the addition of the following:

    The Company's obligation to provide defense shall not be severable with respect to the Named Insured and the **Additional Insured**.

5.  The **Additional Insured** and the Named Insured shall be represented by the same lawyer unless such mutual representation is prohibited by law or by any applicable professional code of conduct.

6.  This insurance shall be excess and non-contributory insurance over any other insurance afforded to the **Additional Insured**.

All other provisions of the policy shall remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | | | |
|---|---|---|---|
| Policy No.: | ME100504 | | |
| Name: | CMGK, LLC dba: Massage Envy | | |
| Policy Effective Date: | March 9, 2018 | Expiration: | March 9, 2019 |
| Endorsement No.: | 8 | | |

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### RESTRICTION OF COVERAGE - SCHEDULED LOCATION(S) – E1861MEJ-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the insurance provided under this policy shall apply solely to **Professional Services** rendered at the location(s) listed below, subject to the Retroactive Date(s) and Termination Date(s) indicated, if any:

| Physical Location Address | Retroactive Date | Termination Date |
|---|---|---|
| 278 Consumer Sq.<br>Mays Landing, NJ 08330 | March 9, 2014 | N/A |

If no Retroactive Date is indicated above for a location, the Retroactive Date stated in Item 7 of the Declarations will apply to such location. If no Termination Date is indicated above for a location, coverage under this Policy will continue for **Professional Services** rendered at that location until expiration or termination of the **Policy Period**.

All other provisions of the policy shall remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018     Expiration:     March 9, 2019 |
| Endorsement No.: | 9 |

**All other terms and conditions of the Policy remain unchanged.**

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### SEXUAL ACTS LIABILITY – E1861MEK-0617

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.    Section "Insuring Agreement" is amended by the addition of the following:

**Sexual Acts Liability:**   The Company shall pay on behalf of an Insured all sums in excess of the Deductible amount stated in this Endorsement, which the Insured shall become legally obligated to pay as **Damages** as a result of **Claims** first made against the Insured during the **Policy Period** or during the Extended Reporting Period, if exercised, for **Sexual Injury** arising out of any **Sexual Act** perpetrated or alleged to have been perpetrated by the Insured or by any person for whose actions the Insured is legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury** provided:

A.    such **Sexual Act** arises out of the conduct of the Insured's **Professional Services**; and

B.    such **Sexual Act** is perpetrated or alleged to have been perpetrated during the **Policy Period** or on or after the Retroactive Date stated in Item 7. of the Declarations and before the end of the **Policy Period**; and

C.    prior to the effective date of this policy, the Insured had no knowledge of such **Sexual Act** or any fact, circumstance, situation or incident involving such **Sexual Act** which may result in a **Claim** under this policy; and

D.    the **Claim** is reported to us by an insured in writing during the **Policy Period** or during the Extended Reporting Period, if applicable.

2.    Section "Definitions" is amended by the addition of the following:

**Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of an Insured's **Professional Services**.

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a **Sexual Act**.

3.    Exclusion "I" of The Exclusions Section is deleted in its entirety and replaced by the following:

I.    any **Claim** based upon or arising out of any **Sexual Act**, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature.

This exclusion does not apply to the coverage provided by the Sexual Acts Liability Endorsement to the Policy.

---

**All other terms and conditions of the Policy remain unchanged.**

4.  Section "The Exclusions" is amended by the addition of the following exclusions:

Q.  any Insured who perpetrates or is alleged to have perpetrated a **Sexual Act** resulting in a **Sexual Injury**; provided, however, the Company will pay **Claim Expenses**, in excess of the Deductible, incurred in defending any such **Claim** until such time as there is a final adjudication, judgment or criminal conviction against an insured employee or an admission by the employee establishing such **Sexual Act**, at which time the Named Insured shall assist the Company in seeking reimbursement from the involved employee, only if the policy is utilized in defending such employee. If the employee utilizes their own insurance company for coverage there will be no reimbursement;

R.  to any manager, supervisor, officer, director, trustee or partner who gains knowledge of any actual or alleged **Sexual Act** and fails to take reasonable care to prevent a future **Sexual Act**;

S.  any **Claim** based upon or arising out of any **Sexual Act** which is perpetrated by an Insured who was previously found guilty in a court of law or admitted fault for a previous perpetrated **Sexual Act**, and after a manager, supervisor, officer, director, trustee or partner has gained knowledge of the previously perpetrated **Sexual Act**; or

T.  any **Claim** based upon or arising out of **Sexual Injury** to any employee of an Insured.

5.  Section "Limits of Liability" is amended by the addition of the following:

F.  **Limit of Liability - Sexual Acts Liability Coverage**: The total liability of the Company for the combined total of **Damages** and **Claim Expenses** for all **Claims** insured herein because of **Sexual Injury** or allegations that an Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated **Sexual Act** resulting in **Sexual Injury** is limited to:

1.  $1,000,000.00 All **Claims** Made by Each Claimant
2.  $2,000,000.00 All **Claims** under Sexual Acts Liability Coverage

**Multiple Sexual Acts**: Two or more **Sexual Acts** against one person shall be deemed to be one **Sexual Act** and shall be subject to the coverage and limits in effect at the time of the first **Sexual Act**.

6.  Section "Limits of Liability", paragraph B., is amended by the addition of the following:

Subject to Section "Limits of Liability", paragraph F., Limits of Liability - Sexual Acts Liability Coverage, the total liability of the Company for all **Damages** and **Claim Expenses** for all **Claims** first made against an Insured during the **Policy Period** and the Extend Reporting Period, if exercised, because of **Sexual Injury** or allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury** shall be part of and not in addition to the Policy Aggregate Limit of Liability stated in Item 5 of the Declarations.

7.  It is agreed that a Deductible of $15,000.00 shall apply to each **Claim** covered under this Sexual Liability Acts Endorsement. If two or more **Claims** are made by one claimant, only one Deductible shall apply to all such **Claims**.

All other provisions of the policy shall remain unchanged.



This endorsement is to take effect on March 9, 2018.

Policy No.:                    ME100504

Name:                          CMGK, LLC dba: Massage Envy

Policy Effective Date:    March 9, 2018          Expiration:    March 9, 2019

Endorsement No.:          10

**All other terms and conditions of the Policy remain unchanged.**

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

**SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT**

**TERMINATION – E1861MEM-0617**

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

A. The Insuring Agreement terminates and there is no coverage for any act, error or omission by a person who otherwise qualifies as an Insured (hereinafter referred to as an "Offender" for purposes of this endorsement) under this Policy:

    1. If:

        a. You; or
        b. Any of your partners, members, managers, officers, directors or trustees learn of any sexual misconduct, sexual crime, **Sexual Act**, theft or any other dishonest act committed by the Offender, regardless of when the conduct occurred; and

    2. the Offender has admitted or there has been an adjudication of fault, liability or criminal guilt in a court, administrative hearings or arbitration; and

    3. You have not terminated, in writing, the employment of, or your business relationship with, the Offender within 30 days of the adjudication or admission.

B. The termination of coverage will be effective after all three subsections under A, above, are met.

All other provisions of the policy shall remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018     Expiration:     March 9, 2019 |
| Endorsement No.: | 11 |

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

**SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT**

**WAR AND TERRORISM EXCLUSION – E1861MEN-0617**

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

Notwithstanding any provision to the contrary within this Policy or any endorsement thereto, it is agreed that this Policy excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

(1) war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

(2) any act of terrorism for the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to (1) and/or (2) above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

NMA2918

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018   Expiration:   March 9, 2019 |
| Endorsement No.: | 12 |

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

**SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT**

**STRETCHING – E1861MEQ-0617**

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium paid, it is hereby understood and agreed that the definition of **Professional Services** is extended to include stretching.

All other terms and conditions remain unchanged.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018     Expiration:    March 9, 2019 |
| Endorsement No.: | 13 |

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

## SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY ENDORSEMENT

### e-MD® – E1861MER-0717

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE FORM

In consideration of the premium charged and notwithstanding anything contained in the Policy to the contrary, it is understood and agreed that the Policy is amended to include e-MD coverage on a Claims-Made and Reported Basis. The terms, conditions, exclusions, Limits of Liability, and **retention** amounts set forth in this Endorsement apply only to e-MD coverage. All other terms, conditions and exclusions of the Policy remain unchanged and apply in full force and effect unless this Endorsement states otherwise.

### e-MD® DECLARATIONS

Item 1. **Limits of Liability per Insuring Agreement**:

| | | | |
|---|---|---|---|
| A. | Multimedia Liability | $ | 50,000.00 per **claim** and in the aggregate |
| B. | Security and Privacy Liability: | $ | 50,000.00 per **claim** and in the aggregate |
| C. | Privacy Regulatory Defense and Penalties: | $ | 50,000.00 per **claim** and in the aggregate |
| D. | Breach Event Costs: | $ | 50,000.00 per **claim** and in the aggregate |
| | Proactive Privacy Breach Response Costs Sublimit: | $ | 25,000.00 per **claim** and in the aggregate |
| | Voluntary Notification Expenses Sublimit: | $ | 50,000.00 per **claim** and in the aggregate |
| E. | BrandGuard®: | $ | 50,000.00 per **claim** and in the aggregate |
| F. | Network Asset Protection: | $ | 50,000.00 per **claim** and in the aggregate |
| G. | Cyber Extortion: | $ | 50,000.00 per **claim** and in the aggregate |
| H. | Cyber Crime: | $ | 5,000.00 per **claim** and in the aggregate |
| I. | PCI DSS Liability: | $ | 10,000.00 per **claim** and in the aggregate |

Item 2. **Maximum Aggregate Limit of Liability**:      $   50,000.00

Item 3. **Retention, Waiting Period and Period of Indemnity**:

| | | | |
|---|---|---|---|
| A. | Multimedia Liability: | $ | 2,500.00 per **claim** |
| B. | Security and Privacy Liability: | $ | 2,500.00 per **claim** |
| C. | Privacy Regulatory Defense and Penalties: | $ | 2,500.00 per **claim** |
| D. | Breach Event Costs: | $ | 2,500.00 per **claim** |
| E. | BrandGuard®: | | |
| | **Waiting Period** | | 2 weeks |
| | **Period of Indemnity** | | 6 months |
| F. | Network Asset Protection | | |
| | 1. Data Recovery | $ | 2,500.00 per **claim** |
| | 2. Non-Physical Business Interruption | | 8 hour **waiting period** |
| G. | Cyber Extortion: | $ | 2,500.00 per **claim** |
| H. | Cyber Crime: | $ | 2,500.00 per **claim** |
| I. | PCI DSS Liability | $ | 2,500.00 per **claim** |

Item 4. **Retroactive Date:**      March 9, 2018

Item 5. **Endorsement Period:**      March 9, 2018 to March 9, 2019

---

**All other terms and conditions of the Policy remain unchanged.**

## e-MD® TERMS AND CONDITIONS

Various terms and conditions in this Endorsement restrict coverage.  Read the entire Endorsement carefully to determine the **Insured's** rights and duties, and what is and is not covered.

Throughout this Endorsement, the words "we," "us," and "our" refer to the Underwriters providing this insurance. Other words and phrases that appear in bold face type have special meaning as described in **Part V. e-MD Definitions** of this Endorsement.

### Part I.      e-MD Insuring Agreements

Underwriters agree with the **Named Insured** to provide coverage as follows:

**A.      Multimedia Liability**

The Underwriters will pay on behalf of an **Insured** the sums in excess of the **retention** and within the applicable Limits of Liability that such **Insured** becomes legally obligated to pay as **damages**, including liability **assumed under contract**, and related **claim expenses** resulting from a **claim** for an actual or alleged **multimedia wrongful act**, but only if: 1) the **claim** is first made against the **Insured** during the **endorsement period** (or during the Extended Reporting Period, if applicable), 2) the **claim** is reported to the Underwriters in writing in accordance with **Part VI. e-MD Notice Provisions** of this Endorsement, and 3) the **multimedia wrongful act** takes place on or after the **retroactive date**.

**B.      Security and Privacy Liability**

The Underwriters will pay on behalf of an **Insured** the sums in excess of the **retention** and within the applicable Limits of Liability that such **Insured** becomes legally obligated to pay as **damages**, including liability **assumed under contract**, and related **claim expenses** resulting from a **claim** for an actual or alleged **security and privacy wrongful act**, but only if: 1) the **claim** is first made against the **Insured** during the **endorsement period** (or during the Extended Reporting Period, if applicable), 2) the **claim** is reported to the Underwriters in writing in accordance with **Part VI. e-MD Notice Provisions** of this Endorsement, and 3) the **security and privacy wrongful act** takes place on or after the **retroactive date**.

**C.      Privacy Regulatory Defense and Penalties**

The Underwriters will pay on behalf of an **Insured** the sums in excess of the **retention** and within the applicable Limits of Liability that such **Insured** becomes legally obligated to pay as a **regulatory compensatory award** or **regulatory fines and penalties** (to the extent insurable by law) and related **claim expenses** resulting from a **privacy regulatory proceeding** instituted against the **Insured** because of a **security breach** or **privacy breach**, but only if: 1) the **privacy regulatory proceeding** is instituted against the **Insured** during the **endorsement period** (or during the Extended Reporting Period, if applicable), 2) the **privacy regulatory proceeding** is reported to the Underwriters in writing in accordance with **Part VI. e-MD Notice Provisions** of this Endorsement, and 3) the **security breach** or **privacy breach** occurs on or after the **retroactive date**.

**D.      Breach Event Costs**

Subject to the applicable **retention** and Limits of Liability, the Underwriters will pay on **your** behalf the **privacy breach response costs**, **notification expenses**, and **breach support and credit monitoring expenses** that **you** incur because of an **adverse media report**, **security breach** or **privacy breach**, but only if: 1) the **adverse media report**, **security breach** or **privacy breach** occurs on or after the **retroactive date**, 2) the **adverse media report**, **security breach** or **privacy breach** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), and 3) the **adverse media report**, **security breach** or **privacy breach** is reported to the Underwriters in writing in accordance with **Part VI. e-MD Notice Provisions** of this Endorsement.

---

**All other terms and conditions of the Policy remain unchanged.**

**E.    BrandGuard**

Subject to the applicable **waiting period** and Limits of Liability, the Underwriters will indemnify **you** for provable and ascertainable **brand loss** that **you** sustain during the **period of indemnity** as a direct result of an **adverse media report** or **notification**, but only if: 1) the **adverse media report** is first discovered by **you** or **your executive**, or the **notification** first occurs, during the **endorsement period** (or during the Extended Reporting Period, if applicable), 2) the **adverse media report** or **notification** results from a **security breach** or **privacy breach** that occurs on or after the **retroactive date**, 3) the **brand loss** is reported to the Underwriters in writing during the **period of indemnity**, and 4) **you** provide clear evidence that the **brand loss** is directly attributable to the **adverse media report** or **notification**.

**F.    Network Asset Protection**

**1.    _Data Recovery_**

Subject to the applicable **retention** and Limits of Liability, the Underwriters will indemnify **you** for **digital assets loss** and **special expenses** that **you** incur because of damage, alteration, corruption, distortion, theft, misuse, or destruction of **digital assets** which results from a **covered cause of loss**, but only if: 1) the **covered cause of loss** occurs on or after the **retroactive date**; 2) the **covered cause of loss** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), and 3) the **covered cause of loss** is reported to the Underwriters in writing in accordance with **_Part VI. e-MD Notice Provisions_** of this Endorsement.

**Digital assets loss** and **special expenses** will be reimbursed for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse, or destruction of **digital assets**.

**2.    _Non-Physical Business Interruption and Extra Expense_**

Subject to the applicable **waiting period** and Limits of Liability, the Underwriters will indemnify **you** for **income loss**, **interruption expenses**, and **special expenses** that **you** incur during the **period of restoration** because of a total or partial interruption, degradation in service, or failure of an **insured computer system** which results from a **covered cause of loss**, but only if: 1) the **covered cause of loss** occurs on or after the **retroactive date**; 2) the **covered cause of loss** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), and 3) the **covered cause of loss** is reported to the Underwriters in writing in accordance with **_Part VI. e-MD Notice Provisions_** of this Endorsement.

**G.    Cyber Extortion**

Subject to the applicable **retention** and Limits of Liability, the Underwriters will indemnify **you** for **cyber extortion expenses** and **cyber extortion monies** that **you** pay as a direct result of a **cyber extortion threat**, but only if: 1) the **cyber extortion threat** is made against **you** on or after the **retroactive date** but before the end of the **endorsement period** (or during the Extended Reporting Period, if applicable), and 2) the **cyber extortion threat** is reported to the Underwriters in writing in accordance with **_Part VI. e-MD Notice Provisions_** of this Endorsement.

The Underwriters will not be obligated to pay **cyber extortion expenses** or **cyber extortion monies** unless the Underwriters have given prior written authorization for the payment of **cyber extortion monies** in response to a **cyber extortion threat**. The Insured must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation or similar equivalent foreign agency before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

---

**All other terms and conditions of the Policy remain unchanged.**

**H.**   **Cyber Crime**

    **1.**   *Financial Fraud*

Subject to the applicable **retention** and Limits of Liability, the Underwriters will indemnify **you** for **financial fraud loss** that **you** sustain because of **financial fraud**, but only if: 1) the **financial fraud** occurs on or after the **retroactive date**, 2) the **financial fraud** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), 3) the **financial fraud** is reported to the Underwriters in writing in accordance with *Part VI. e-MD Notice Provisions* of this Endorsement, and 4) **your** bank or credit card company has refused to reverse or prevent a payment transaction, or to indemnify or reimburse **you** for the **financial fraud loss**, and **you** provide written confirmation to the Underwriters of such refusal.

    **2.**   *Telecommunications Fraud*

Subject to the applicable **retention** and Limits of Liability, the Underwriters will indemnify **you** for **telecommunications fraud loss** that **you** sustain because of **telecommunications fraud**, but only if: 1) the **telecommunications fraud** occurs on or after the **retroactive date**, 2) the **telecommunications fraud** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), and 3) the **telecommunications fraud** is reported to the Underwriters in writing in accordance with *Part VI. e-MD Notice Provisions* of this Endorsement.

    **3.**   *Phishing Attack*

Subject to the applicable **retention** and Limits of Liability, the Underwriters will indemnify **you** for **phishing attack loss** that **you** sustain because of a **phishing attack**, but only if: 1) the **phishing attack** occurs on or after the **retroactive date**, 2) the **phishing attack** is first discovered by **you** or **your executive** during the **endorsement period** (or during the Extended Reporting Period, if applicable), and 3) the **phishing attack** is reported to the Underwriters in writing in accordance with *Part VI. e-MD Notice Provisions* of this Endorsement.

**I.**   **PCI DSS Liability**

The Underwriters will pay on behalf of an **Insured** the sums in excess of the **retention** and within the applicable Limits of Liability that such **Insured** becomes legally obligated to pay as **PCI DSS assessments** and related **claim expenses** because of a **claim** resulting from a **security breach** or **privacy breach**, but only if: 1) the **claim** is first made against the **Insured** during the **endorsement period** (or during the Extended Reporting Period, if applicable), 2) the **claim** is reported to the Underwriters in writing in accordance with *Part VI e-MD Notice Provisions* of this Endorsement, and 3) the **security breach** or **privacy breach** takes place on or after the **retroactive date**.

*Part II.*   *e-MD Defense and Settlement Provisions*

The following defense and settlement provisions will apply only to the coverage provided under this Endorsement and will supersede any other defense and settlement provisions contained elsewhere in the Policy.

**A.**   We have the right and duty to defend an **Insured** against any **claim** covered under Insuring Agreement A, B, C, or I, even if the allegations are groundless, false or fraudulent. We have the right to appoint an attorney to defend any such **claim**.

**B.**   The Limits of Liability available to pay **damages** will be reduced, and may be completely exhausted, by payment of **claim expenses** or any other amounts covered under this Endorsement. **Damages**, **claim expenses**, and any other amounts covered under this Endorsement will be applied against the applicable **retention**, which must paid by the **Insured**.

---

**All other terms and conditions of the Policy remain unchanged.**

C.     The **Insured** shall not pay any **damages**, **claim expenses**, or other amounts covered under this Endorsement, or settle or offer to settle any **claim**, assume any contractual obligation, admit liability, voluntarily make any payment, or confess or otherwise consent to any **damages** or judgments without our prior written consent, which consent will not be unreasonably withheld.  We will not be liable for any **damages**, **claim expenses**, settlement, judgment, assumed obligation, admitted liability, voluntary payment or confessed **damages** to which we have not consented.

D.     We have the right to make any investigation we deem necessary, including, without limitation, any investigation with respect to coverage.

E.     With respect to Insuring Agreements A, B, C, and I only, we will not settle any **claim** or pay any **damages**, **regulatory compensatory award**, **regulatory fines and penalties**, or **PCI DSS fines and assessments**, whichever applies, without the **Insured's** consent.  If an **Insured** refuses to consent to any settlement or compromise recommended by us or our representatives that is acceptable to the claimant, and the **Insured** elects to contest the **claim** or continue any legal proceedings in connection with such **claim**, then our liability for **damages**, **claim expenses**, **regulatory compensatory award**, **regulatory fines and penalties**, or **PCI DSS fines and assessments**, whichever applies, will not exceed the following amount, subject to the Limits of Liability:

1.     The amount for which the **claim** could have been settled, less the remaining **retention**, and **claim expenses** incurred as of the date the **Insured** withheld consent to such settlement, plus
2.     Fifty percent (50%) of any **damages**, **claim expenses**, **regulatory compensatory award**, **regulatory fines and penalties** or **PCI DSS fines and assessments** incurred after the date the **Insured** withheld consent to such settlement or compromise. The remaining fifty percent (50%) of such **damages**, **claim expenses**, **regulatory compensatory award**, **regulatory fines and penalties**, or **PCI DSS fines and assessments**, whichever applies, and any amounts that exceed the applicable Limit of Liability, will be borne by the **Insured** at the **Insured's** own risk and will be uninsured under this Endorsement.

F.     We have no duty to pay any **damages**, **claim expenses**, or other amounts covered under this Endorsement, or to undertake or continue the defense of any **claim**, after the Limit of Liability is exhausted.  Upon exhaustion of the Limit of Liability, the Underwriters shall have the right to withdraw from the further defense of a **claim** by tendering control of said defense to the **Insured**.

*Part III.     e-MD Limits of Liability*

A.     The Limits of Liability set forth in Item 1 of the *e-MD Declarations* are the most we will pay under each Insuring Agreement for each **claim** first made during the **endorsement period** and in the aggregate for all **claims** first made during the **endorsement period**, including **claim expenses** where applicable, regardless of the number of **claims**, claimants or **Insureds**.

B.     The Maximum Aggregate Limit of Liability set forth in Item 2 of the *e-MD Declarations* is the most we will pay for all **claims** first made during the **endorsement period**, including **claim expenses** where applicable, regardless of the number of **claims**, claimants, or **Insureds**, or the number of Insuring Agreements that apply. All amounts we pay under this Endorsement will reduce, and may completely exhaust, the Maximum Aggregate Limit of Liability.

C.     The Limits of Liability set forth in the *e-MD Declarations* are included within, and will reduce the Underwriters' Aggregate Limit of Liability under the Policy, as set forth in the Policy Declarations Page.

D.     All **claims** which arise out of the same, related, or continuing incidents, acts, facts or circumstances will be considered a single **claim**, regardless of the number of **claims** made, **Insureds** affected, or claimants involved.  Only one Limit of Liability will apply to such **claim**.  All **claims** which arise out of the same, related, or continuing incidents, acts, facts or circumstances will be deemed to have been first made on the date the earliest of such **claims** is made and will be deemed to be have been first reported to us on the date the earliest of such **claim** is reported to us.

**All other terms and conditions of the Policy remain unchanged.**

E.    If a **claim** is covered under more than one Insuring Agreement of this Endorsement, only one Limit of Liability will apply to such **claim**. In such event, only the highest of the applicable Limits of Liability will apply. The Underwriters have the sole discretion to allocate **claims** paid, if any, against the appropriate Limit of Liability.

F.    The existence of an Extended Reporting Period will not increase or reinstate the Limits of Liability set forth in the *e-MD Declarations*.

**Part IV.    e-MD *Retention and Waiting Period***

A.    The applicable **retention** amount for each Insuring Agreement, as set forth in Item 3 of the *e-MD Declarations*, will apply separately to each **claim**. The **retention** must be satisfied by the **Insured's** actual payment of **damages**, **claim expenses**, or any other amounts covered under this Endorsement. If a **claim** is covered under more than one Insuring Agreement, only the highest **retention** will apply.

B.    The **Insured's** payment of the applicable **retention** is a condition precedent to payment by the Underwriters of any amounts covered under this Endorsement, and the Underwriters will only be liable for amounts that exceed the **retention**, up to the Limits of Liability set forth in the *e-MD Declarations*. The **Insured** must make direct payments within the **retention** to the appropriate parties designated by the Underwriters.

C.    All **claims** under any one Insuring Agreement which arise out of the same, related, or continuing incidents, acts, facts or circumstances will be considered a single **claim**, regardless of the number of **claims** made, **Insureds** affected, or claimants involved, and only one **retention** will apply to such **claim**.

D.    With respect to Insuring Agreement E and Insuring Agreement **F.2.**, the **waiting period** listed in Item 3 of the *e-MD Declarations* shall apply to covered amounts. The **waiting period** applies to each **period of restoration** or **period of indemnity**, whichever applies.

**Part V.    e-MD *Definitions***

With respect to the coverage provided by this Endorsement, certain words are shown in bold and are defined as follows. Refer to the Definitions section of the Policy for terms that are shown in bold in this Endorsement, but are not defined below. If a term is defined below and in the Policy, the definition below applies only to the coverage provided by this Endorsement.

**Act of cyber terrorism** means the premeditated use of information technology to organize and execute attacks, or the threat thereof, against computers, **computer systems**, networks or the **internet** by any person or group, whether acting alone or on behalf of, or in connection with, any organization or government, which is committed for political, religious, or ideological purposes, with the intention to influence any government, put the public in fear, or cause destruction or harm to critical infrastructure or **data**.

**Acquiring bank** means a bank or financial institution that accepts credit or debit card payments (including stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

**Adverse media report** means a report or communication of an actual or potential **security breach** or **privacy breach** which has been publicized through any media channel, including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, or electronic mail, and threatens material damage to **your reputation** or brand.

**Assumed under contract** means liability for **damages** resulting from a **multimedia wrongful act**, **security breach**, or **privacy breach**, where such liability has been assumed by an **Insured** in the form of a written hold harmless or indemnity agreement, but only if such agreement was executed before the **multimedia wrongful act**, **security breach** or **privacy breach** occurred.

**Bodily injury** means physical injury, sickness, disease, or death sustained by any person and, where resulting from such physical injury only, mental anguish, mental injury, shock, humiliation, or emotional distress.

**BPO service provider** means any independent contractor that provides business process outsourcing services for **your** benefit under a written contract with **you**, including, but not limited to, call center services, fulfillment services, and logistical support.

**Brand loss** means **your** net profit, as could have reasonably been projected immediately prior to **notification**, or in the event of an **adverse media report**, immediately prior to the publication of an **adverse media report**, but which has been lost during the **period of indemnity** as a direct result of such **adverse media report** or **notification**. **Brand loss** will be determined in accordance with the provisions of *Part X. Loss Determination* of this Endorsement.

**Breach support and credit monitoring expenses** means those reasonable and necessary expenses that **you** incur on **your** own behalf, or on behalf of a party for whom **you** are **vicariously liable**, to provide support activity to affected individuals in the event of a **privacy breach**. **Breach support and credit monitoring expenses** includes the cost to set up a call center and to provide a maximum of twelve (12) months of credit monitoring services, identity theft assistance services, or credit repair and restoration services. **Breach support and credit monitoring expenses** must be incurred with the Underwriters' prior written consent.

**Card association** means Visa International, MasterCard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

**Claim** means:

1. With respect to Insuring Agreement A and Insuring Agreement B:
   a. A written demand made against an **Insured** for **damages** or non-monetary relief;
   b. A written request received by an **Insured** to toll or waive a statute of limitations relating to a potential **claim** against an **Insured**; or
   c. The service of a civil lawsuit or the institution of arbitration or other alternative dispute resolution proceedings against an **Insured** seeking **damages**, a temporary restraining order, or a preliminary or permanent injunction.
   A **claim** under Insuring Agreement A or Insuring Agreement B does not include a **PCI DSS demand**.

2. With respect to Insuring Agreement C, a **privacy regulatory proceeding**. A **claim** under Insuring Agreement C does not include a **PCI DSS demand**.

3. With respect to Insuring Agreement D, an **Insured's** written notice to the Underwriters of an **adverse media report**, **security breach** or **privacy breach**.

4. With respect to Insuring Agreement E, an **Insured's** written notice to the Underwriters of an **adverse media report** or **notification** that has resulted or may result in **brand loss**.

5. With respect to Insuring Agreement F, an **Insured's** written notice to the Underwriters of a **covered cause of loss**.

6. With respect to Insuring Agreement G, an **Insured's** written notice to the Underwriters of a **cyber extortion threat**.

7. With respect to Insuring Agreement H, an **Insured's** written notice to the Underwriters of **financial fraud**, **telecommunications fraud** or a **phishing attack**.

8. With respect to Insuring Agreement I, a **PCI DSS demand**.

**Claim expenses** means:

1.  Reasonable and necessary fees incurred with the Underwriters' consent and charged by an attorney(s) designated by the Underwriters to defend against a **claim**; and
2.  All other reasonable and necessary fees, costs, and expenses resulting from the defense and appeal of a **claim**, if incurred by the Underwriters or by an **Insured** with our prior written consent.

**Claim expenses** does not include any wages or salaries of an **Insured**, or fees, overhead or other charges incurred by, or paid to, any **Insured** for any time spent in cooperating in the investigation or defense of a **claim** or a potential **claim**.

**Computer hardware** means the physical components of any **computer system**, including CPUs, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cables, connectors, fiber optics, wires, power supply units, keyboards, display monitors and audio speakers.

**Computer program** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. A **computer program** includes, but is not limited to, the communications, networking, operating systems and related processes used to create, maintain, process, retrieve, store, or transmit electronic **data**.

**Computer system** means an interconnected electronic, wireless, web, or similar system (including all **computer hardware** and software) used to process and store **data** or information in an analogue, digital, electronic or wireless format, including, but not limited to, **computer programs**, electronic **data**, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off-line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

**Computer virus** means a program that possesses the ability to create replicas of itself (commonly known as an "auto-reproduction" program) within other programs or operating system areas, or which can spread copies of itself wholly or partly to other **computer systems**.

**Covered cause of loss** means and is limited to the following:

1.  <u>Accidental Damage or Destruction</u>

    a.  Accidental physical damage to, or destruction of, **electronic media** so that stored **digital assets** are no longer machine-readable;
    b.  Accidental damage to, or destruction of, **computer hardware** so that stored **data** is no longer machine-readable;
    c.  Failure in power supply or under/over voltage, but only if such power supply, including back-up generators, is under **your** direct operational control;
    d.  **Programming error** of **delivered programs**;
    e.  Electrostatic build-up and static electricity.

2.  <u>Administrative or Operational Mistakes</u>

    An accidental, unintentional, or negligent act, error or omission by an **insured**, a **BPO service provider** or an **outsourced IT service provider** in:

    a.  The entry or modification of **data** on an **insured computer system**, which causes damage to such **data**; or
    b.  The creation, handling, development, modification, or maintenance of **digital assets**; or
    c.  The ongoing operation or maintenance of an **insured computer system**, excluding the design, architecture, or configuration of an **insured computer system**.

---

**All other terms and conditions of the Policy remain unchanged.**

3.   <u>Computer Crime and Computer Attacks</u>

An unintentional or negligent act, error or omission by an **insured**, a **BPO service provider**, or an **outsourced IT service provider** in the operation of an **insured computer system** or in the handling of **digital assets**, which fails to prevent or hinder any of the following attacks on an **insured computer system**:

a.   A **denial of service attack**;
b.   **Malicious code**;
c.   **Unauthorized access**;
d.   **Unauthorized use**; or
e.   An **act of cyber terrorism**.

**Cyber extortion expenses** mean all reasonable and necessary costs and expenses, other than **cyber extortion monies**, that **you** incur with the Underwriters' prior written consent as a direct result of a **cyber extortion threat**.

**Cyber extortion monies** mean any **money** or **other property you** pay, with the Underwriters' prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat**, to terminate such **cyber extortion threat**.

**Cyber extortion threat** means a credible threat or series of related credible threats, including a demand for **cyber extortion monies**, which is directed at **you** to:

1.   Release, divulge, disseminate, destroy or use the confidential information of a **third party** taken from an **Insured** as a result of **unauthorized access** to, or **unauthorized use** of, an **insured computer system**;
2.   Introduce **malicious code** into an **insured computer system**;
3.   Corrupt, damage or destroy an **insured computer system**;
4.   Restrict or hinder access to an **insured computer system**, including the threat of a **denial of service attack**; or
5.   Electronically communicate with **your** customers and falsely claim to be **you**, or to be acting under **your** direction, to falsely obtain personal or confidential information (also known as "pharming," "phishing," or other types of false communications).

A series of continuing **cyber extortion threats**, related or repeated **cyber extortion threats**, or multiple **cyber extortion threats** resulting from the same event or incident will be considered a single **cyber extortion threat** and will be deemed to have occurred at the time the first of such **cyber extortion threats** occurred.

**Damages** mean a monetary judgment, award, or settlement, including prejudgment and post-judgment interest awarded against an **Insured** on that part of any judgment paid or to be paid by the Underwriters; and punitive, exemplary or multiplied **damages** to the extent insurable under the law pursuant to which this Endorsement is construed.

With respect to the insurability of punitive, exemplary or multiplied **damages**, the applicable law will be the law of the state most favorable to the **Insured**, provided that the state whose law is most favorable to the **Insured** has a reasonable relationship to the **claim**.

A state's law will be deemed to have a reasonable relationship to the **claim** if it is the state where:

1.   The **Named Insured** is incorporated or has a place of business;
2.   The **claim** is pending; or
3.   Any **multimedia wrongful act** or **security and privacy wrongful act** (whichever applies) was committed or allegedly committed by an **Insured**.

**Damages** do not include:

1.   Any **Insured's** future profits or royalties, restitution, or disgorgement of any **Insured's** profits;

---

**All other terms and conditions of the Policy remain unchanged.**

2. The costs to comply with orders granting injunctive or non-monetary relief, including specific performance, or any agreement to provide such relief;
3. Loss of any **Insured's** fees or profits, the return or offset of any **Insured's** fees or charges, or any **Insured's** commissions or royalties provided or contracted to be provided;
4. Taxes, fines or penalties, or sanctions;
5. Contractual liquidated **damages**, to the extent such **damages** exceed the amount for which the **Insured** would have been liable in the absence of the liquidated **damages** agreement;
6. Any amount which an **Insured** is not financially or legally obligated to pay;
7. Disgorgement of any remuneration or financial advantage to which an **Insured** was not legally entitled;
8. Settlements negotiated without the Underwriters' consent;
9. Monetary judgments, awards, settlements or any other amounts which are uninsurable under the law pursuant to which this Endorsement is construed or any legal fees and costs awarded pursuant to such judgments, awards or settlements;
10. **PCI DSS fines and assessments**.

**Data** means any machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, customer information, health and medical information, or other electronic information that is subject to back-up procedures, irrespective of the way it is used and rendered.

**Delivered programs** means **computer programs** where the development stage has been finalized, having passed all test-runs and been proven successful in a live environment.

**Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack, which is intended by the perpetrator to overwhelm the capacity of a **computer system** by sending an excessive volume of electronic **data** to such **computer system** to prevent access to such **computer system**.

**Digital assets** mean **data** and **computer programs** that exist in an **insured computer system**. **Digital assets** do not include **computer hardware**.

**Digital assets loss** means reasonable and necessary expenses and costs that **you** incur to replace, recreate or restore **digital assets** to the same state and with the same contents immediately before the **digital assets** were damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time. **Digital assets loss** also includes amounts representing **employee** work time to replace, recreate or restore **digital assets**, which will be determined on a predefined billable hour or per-hour basis as based upon **your** schedule of **employee** billable hours. **Digital assets loss** will be determined in accordance with the provisions of *Part X. Loss Determination* of this Endorsement.

**Digital assets loss** does not include:

1. The cost(s) of restoring, updating, or replacing **digital assets** to a level beyond that which existed prior to a **covered cause of loss**;
2. Physical damage to the **computer hardware** or **data** center other than accidental physical damage to, or destruction of, **electronic media** so that stored **digital assets** are no longer machine-readable;
3. Contractual penalties or consequential damages;
4. Any liability to **third parties** for whatever reason, including, but not limited to, legal costs and expenses of any type;
5. Fines or penalties imposed by law;
6. The economic or market value of **digital assets**;
7. Costs or expenses incurred to identify, patch, or remediate software program errors or **computer system** vulnerabilities;
8. Costs to upgrade, redesign, reconfigure, or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**;
9. Any loss paid or payable under Insuring Agreement **F.2.**;
10. The cost(s) of restoring, replacing or repairing **electronic media**; or
11. Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake.

---

**All other terms and conditions of the Policy remain unchanged.**

**Electronic media** means floppy disks, CD ROMs, hard drives, magnetic tapes, magnetic discs, or any other media on which electronic **data** is recorded or stored.

**Employee** means any individual whose labor or service is engaged by and directed by **you**, including volunteers and part-time, seasonal, temporary or leased workers. **Employee** does not include any **executive** or independent contractor.

**Endorsement period** means the period specified as such in Item 5 of the *e-MD Declarations*. Coverage may be canceled or otherwise terminated before the **endorsement period** expiration date.

**Executive** means any director or officer of the **Named Insured**, including any chief executive officer, chief financial officer, chief operations officer, chief technology officer, chief information officer, chief privacy officer, general counsel or other in-house lawyer, and risk manager thereof.

**Financial fraud** means any of the following:

1. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution, directing such institution to debit **your** account and to transfer, pay or deliver **money** or **securities** from **your** account, which instruction purports to have been transmitted by **you**, an **executive**, or an **employee**, but was in fact fraudulently transmitted by a **third party** without **your** knowledge or consent; or
2. An intentional, unauthorized and fraudulent written, electronic or telephonic instruction transmitted to a financial institution by an **executive** or **employee** as a result of that **executive** or **employee** receiving intentional, misleading or deceptive telephonic or electronic communications from a **third party** falsely purporting to be **you** or **your** client, vendor, **executive** or **employee**, and which directs the financial institution to debit **your** account and to transfer, pay or deliver **money** or **securities** from **your** account; or
3. The theft of **money** or **securities** from **your** bank account or corporate credit cards by electronic means.

**Financial fraud loss** means **your** loss of **money** or **securities**, which is directly caused by **financial fraud**. **Financial fraud loss** does not include any amounts reimbursed to **you** by any financial institution.

**Firmware** means the fixed programs that internally control basic low-level operations in a device.

**First party insured event** means:

1. With respect to Insuring Agreement D, an **adverse media report**, **security breach** or **privacy breach**;
2. With respect to Insuring Agreement E, a **security breach** or **privacy breach**;
3. With respect to Insuring Agreement F, a **covered cause of loss**;
4. With respect to Insuring Agreement G, a **cyber extortion threat**;
5. With respect to Insuring Agreement H, **financial fraud**, **telecommunications fraud**, or a **phishing attack**.

**First party insured event** only pertains to loss sustained by **you** and does not include any **claim** made by a **third party**.

**Income loss** means the net profit loss **you** sustain during the **period of restoration** as a direct result of a **covered cause of loss**. **Income loss** will be determined in accordance with the provisions of *Part X. Loss Determination* of this Endorsement.

**Income loss** does not include:

1. Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake;
2. Any loss or expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
3. Contractual penalties or consequential damages;

---

**All other terms and conditions of the Policy remain unchanged.**

4. Any liability to **third parties** for whatever reason, including, but not limited to, legal costs and expenses of any type;
5. Fines or penalties imposed by law;
6. Costs or expenses incurred to identify, patch, or remediate software program errors or **computer system** vulnerabilities;
7. Loss of goodwill or reputational harm;
8. Costs to upgrade, redesign, reconfigure, or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. Any losses paid or payable under Insuring Agreement **F.1.** of this Endorsement.

**Insured** means any person or entity who qualifies as an "insured" under the Policy to which this Endorsement is attached.

**Insured computer system** means a **computer system** operated by, and either owned by or leased to, **you**. With respect to Insuring Agreement B only, **insured computer system** also includes a **computer system** operated by a **BPO service provider** or an **outsourced IT service provider**, which is used to provide hosted computer application services to **you**, or for processing, maintaining, hosting, or storing **data** for **you**, pursuant to a written contract with **you** to provide such services. With respect to Insuring Agreement G only, **insured computer system** also includes a system operated by an organization providing computing resources to **you** that are delivered as a service over a network or the **internet** (commonly known as "cloud computing"), including Software as a Service, Platform as a Service and Infrastructure as a Service.

**Insured telecommunications system** means any telephone or fax network or system that **you** own, rent, lease, license, or borrow.

**Internet** means the worldwide public network of computers which enables the transmission of electronic **data** between different users, including a private communications network existing within a shared or public network platform.

**Interruption expenses** mean those reasonable and necessary expenses, excluding **special expenses**, incurred by **you** to avoid or minimize the suspension of **your** business because of a total or partial interruption, degradation in service, or failure of an **insured computer system** caused by a **covered cause of loss**, which **you** would not have incurred had no **covered cause of loss** occurred. **Interruption expenses** include, but are not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of **third party** services, or additional staff expenditures or labor costs. The amount of **interruption expenses** recoverable shall not exceed the amount by which the covered **income loss** is reduced by such incurred expenses.

**Interruption expenses** do not include:

1. Any loss arising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake;
2. Any loss expense arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
3. Contractual penalties or consequential damages;
4. Any liability to **third parties** for whatever reason, including, but not limited to, legal costs and expenses of any type;
5. Fines or penalties imposed by law;
6. Costs or expenses incurred to identify, patch, or remediate software program errors or **computer system** vulnerabilities;
7. Loss of goodwill or reputational harm;
8. Costs to upgrade, redesign, reconfigure, or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
9. Any losses paid or payable under Insuring Agreement **F.1.**

**Malicious code** means software intentionally designed to insert itself by a variety of forms into a **computer system**, without the owner's informed consent, and cause damage to the **computer system**. **Malicious code** includes, but is not limited to, **computer viruses**, worms, Trojan horses, spyware, dishonest adware, and crimeware.

**Media material** means communicative material of any kind or nature for which **you** are responsible, including, but not limited to, words, pictures, sounds, images, graphics, code and **data**, regardless of the method or medium of communication of such material or the purpose for which the communication is intended. **Media material** does not include any tangible goods or products that are manufactured, produced, processed, prepared, assembled, packaged, labeled, sold, handled or distributed by **you** or others trading under **your** name.

**Merchant services agreement** means an agreement between **you** and an **acquiring bank**, **card association**, brand, network, credit or debit card processor, independent sales organization, gateway, or membership service, which enables **you** to accept payment by credit card, debit card or prepaid card.

**Money** means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including, but not limited to, currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

**Multimedia wrongful act** means any of the following, whether actual or alleged, but only if directly resulting from the dissemination of **media material** by an **Insured**:

1   Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement or trade libel, and infliction of emotional distress, mental anguish, outrage or outrageous conduct, if directly resulting from any of the foregoing;
2.   Invasion, infringement or interference with an individual's right of privacy or publicity, including the torts of false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;
3.   Plagiarism, piracy or misappropriation of ideas under an implied contract;
4.   Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name;
5.   Domain name infringement or improper deep-linking or framing;
6.   Negligence in **media material**, including a **claim** alleging harm to any person or entity that acted or failed to act in reliance upon such **media material**;
7.   False arrest, detention or imprisonment;
8.   Trespass, wrongful entry or eviction, eavesdropping, or other invasion of the right of private occupancy; or
9.   Unfair competition, but only when arising out of a peril described in 1. through 8. above.

**Notification** means written notice to affected individuals in the event of a **security breach** or **privacy breach**.

**Notification expenses** means those reasonable and necessary legal expenses, forensic and investigation expenses, **public relations expenses**, postage expenses, and related advertising expenses that **you** incur on **your** own behalf, or on behalf of a party for who **you** are **vicariously liable**, to comply with governmental privacy legislation mandating **notification** to affected individuals in the event of a **security breach** or **privacy breach**. **Notification expenses** must be incurred with the Underwriters' prior written consent. **Notification expenses** also includes **voluntary notification expenses**.

**Other property** means any tangible property, other than **money** or **securities**, which has intrinsic value.

**Outsourced IT service provider** means an independent contractor that provides information technology services for **your** benefit, under a written contract with **you** to provide such services.  **Outsourced IT service provider** services include, but are not limited to, hosting, security management, co-location, and **data** storage.

**PCI Data Security Standard** (known as "PCI DSS") means the Payment Card Industry Security Standards Council Data Security Standard in effect now, or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder **data**.

---

**All other terms and conditions of the Policy remain unchanged.**

**PCI DSS demand** means a written demand for **PCI DSS fines and assessments** received by an **Insured** directly or indirectly from or through an **acquiring bank**, **card association**, or payment card processor due to the **Insured's** non-compliance with the **PCI Data Security Standard**.

**PCI DSS fines and assessments** means monetary fines, penalties or assessments (including fraud recoveries, card reissuance costs, operational expenses, or compliance case costs) owed by an **Insured** under the terms of a **merchant services agreement**, but only where such monetary fines, penalties or assessments result from a **security breach** or **privacy breach**.

**Period of indemnity** means the period beginning on the earlier of the date of **notification** or the first **adverse media report** (whichever applies), and ending on the earlier of:

1. The date that gross revenues are restored to the level they had been prior to **notification** or the first **adverse media report** (whichever applies); or
2. The last day of the period set forth Item 3 of the *e-MD Declarations* as the **period of indemnity** applicable to Insuring Agreement E.

**Period of restoration** means the period beginning on the date when the interruption, degradation in service, or failure of an **insured computer system** began, and ending on the earlier of:

1. The date when an **insured computer system** is restored or could have been repaired or restored with reasonable speed to the same condition, functionality and level of service that existed prior to the **covered cause of loss**, plus a maximum of thirty (30) additional consecutive days after the restoration of an **insured computer system** to allow for restoration of **your** business; or
2. One hundred twenty (120) consecutive days after the notice of **covered cause of loss** is received by the Underwriters.

**Personally identifiable information** means information that can be used to determine, distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information that is linked or linkable to a specific individual.

**Phishing attack** means the use of fraudulent electronic communications or malicious websites to impersonate **you**, **your** brand, or **your** products or services to solicit **private information**.

**Phishing attack loss** means:

1. Expenses that **you** incur, with the Underwriters' prior written consent, to create and issue a specific press release or to establish a specific website to advise **your** customers and prospective customers of a **phishing attack**; and
2. The cost of reimbursing **your** existing customers for their losses arising directly from a **phishing attack**.

**Print media** means newspapers, newsletters, magazines, books and literary works in any form, brochures or other types of publications, and advertising materials including packaging, photographs, and digital images.

**Privacy breach** means any of the following:

1. The unauthorized collection, disclosure, use, access, destruction or modification of **private information**;
2. The inability to access, or failure to provide, **private information**;
3. Theft of **private information**;
4. The surrender of **private information** as a result of false communications or social engineering techniques, including but not limited to phishing, spear-phishing, and pharming;
5. Failure to implement, maintain, or comply with privacy policies and procedures stating **your** obligations regarding **private information**, including but not limited to **your privacy policy**;
6. Failure to develop or administer an identity theft prevention program;

---

**All other terms and conditions of the Policy remain unchanged.**

7. Failure to implement specific security practices with respect to **private information** required by any **privacy regulations**;
8. An infringement or violation of any rights to privacy;
9. Breach of a person's right of publicity, false light, intrusion upon a person's seclusion;
10. Failure to comply with **privacy regulations** pertaining to the **Insured's** responsibilities with respect to **private information**, but only relating to an act listed in paragraphs 1 through 8 above; or
11. Failure to comply with any federal, state, foreign or other law (including common law), statute or regulation prohibiting unfair or deceptive trade practices or consumer fraud pertaining to the **Insured's** responsibilities with respect to **private information**, but only relating to an act listed in paragraphs 1 through 8 above.

A series of continuing **privacy breaches**, related or repeated **privacy breaches**, or multiple **privacy breaches** resulting from the same event or incident will be considered a single **privacy breach** and will be deemed to have occurred at the time the first of such **privacy breaches** occurred.

**Privacy breach response costs** means:

1. Those reasonable and necessary fees and expenses that **you** incur, with the Underwriters' prior written consent, for the employment of a public relations consultant, if such action is reasonably necessary to avert or mitigate any material damage to **your reputation** or brands, which results or reasonably could result from an **adverse media report**; and
2. **Proactive privacy breach response costs** incurred with the Underwriters' prior written consent, subject to the **proactive privacy breach response costs sub-limit**.

**Privacy regulations** means federal, state or local statutes, rules, regulations and other laws, as they currently exist and as amended, associated with the confidentiality, access, control, and use of **private information**, including, but not limited to:

1. Health Insurance Portability and Accountability Act of 1996 (Public Law 104- 191), known as HIPAA, and related or similar state medical privacy laws;
2. Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999, including sections concerning security protection and standards for customer records maintained by financial services companies, and the rules and regulations promulgated thereunder;
3. State and Federal statutes and regulations regarding the security and privacy of consumer information;
4. Governmental privacy protection regulations or laws associated with the control and use of personal information, including but not limited to requirements to post or publish **your privacy policy**, adopt specific privacy controls, or inform customers of actual or suspected **privacy breaches**;
5. Privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;
6. Children's Online Privacy Protection Act or similar laws, as they exist now or in the future;
7. The EU Data Protection Act or other similar privacy and security statutes, rules, regulations or other laws worldwide, as they exist now or in the future; and
8. The Health Information Technology for Economic and Clinical Health Act (HITECH ACT), enacted under Title XIII of the American Recovery and Reinvestment Act of 2009 (ARRA) (Pub. L. 111-5), and its implementing regulations, including related or similar state medical privacy laws.

**Privacy regulatory proceeding** means a formal civil administrative proceeding or regulatory action instituted against an **Insured** by a federal, state or local governmental body because of a **security breach** or **privacy breach**.

**Private information** means:

1. Proprietary or confidential information owned by a **third party** that is in the care, custody or control of an **Insured** or is used by an **Insured** with the consent of such **third party**;
2. **Personally Identifiable Information**; and
3. Any information that is linked or linkable to a specific individual and that is subject to any **privacy regulations**.

---

**All other terms and conditions of the Policy remain unchanged.**

**Proactive privacy breach response costs** mean those reasonable and necessary **public relations expenses** that **you** incur in response to an actual or potential **security breach** or **privacy breach**, but prior to the publication of an **adverse media report**, to avert or mitigate the potential impact of an **adverse media report**. **Proactive privacy breach response costs** must be incurred with the Underwriters' prior written consent and are subject to the **proactive privacy breach response costs sublimit**.

**Proactive privacy breach response costs sublimit** means the maximum amount that the Underwriters will pay for **proactive privacy breach response costs**. The **proactive privacy breach response costs sublimit** is included within, and will erode, the Limits of Liability for Insuring Agreement D.

**Programming error** means an error which occurs during the development or encoding of a **computer program**, software or application and which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

**Property damage** means physical injury to, or impairment, destruction or corruption of, any tangible property, including the loss of use thereof. **Data** is not considered tangible property.

**Public relations expenses** mean expenses that **you** incur to re-establish **your reputation**, which was damaged as a direct result of an **adverse media report**.

**Regulatory compensatory award** means a sum of **money** which an **Insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a **third party**, due to an adverse judgment or settlement arising out of a **privacy regulatory proceeding**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

**Regulatory fines and penalties** means civil fines or penalties imposed by a federal, state, or local governmental regulatory body against an **insured** in a **privacy regulatory proceeding**. **Regulatory fines and penalties** does not include: 1) any criminal fines or penalties of any nature whatsoever; or 2) **PCI DSS fines and assessments**.

**Retention** means the amount specified as such in Item 3 of the **e-MD Declarations**.

**Retroactive date** means the date specified as such in Item 4 of the **e-MD Declarations**, on or after which **wrongful acts** or **first party insured events** must have taken place to be considered for coverage under this Endorsement.

**Securities** means negotiable or non-negotiable instruments or contracts representing **money** or **other property**, but does not include **money**.

**Security and privacy wrongful act** means any of the below, whether actual or alleged, but only if committed by an **Insured** in their capacity as such:

1. The failure to prevent or hinder a **security breach**, which in turn results in:

   a. The alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on an **insured computer system**;
   b. Theft, loss or unauthorized disclosure of electronic or non-electronic **private information** that is in **your** care, custody or control;
   c. Theft, loss or unauthorized disclosure of electronic or non-electronic **private information** that is in the care, custody or control of a **BPO service provider** or an **outsourced IT service provider** that is holding, processing or transferring such **private information** on **your** behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while **your** written contract with such **BPO service provider** or **outsourced IT service provider** is still in effect;
   d. **Unauthorized access** to, or **unauthorized use** of, a **computer system** other than an **insured computer system**;

---

    e.  the inability of an authorized **third party** to gain access to **your** services;

2. The failure to timely disclose a **security breach** affecting **private information**; or the failure to dispose of **private information** within the required period, in violation of **privacy regulations**;
3. The failure to prevent the transmission of a **malicious code** or **computer virus** from an **insured computer system** to the **computer system** of a **third party**;
4. A **privacy breach**;
5. The failure to prevent a **privacy breach**;
6. The failure to prevent or hinder participation by an **insured computer system** in a **denial of service attack** directed against **internet** sites or the **computer system** of a **third party**;
7. Loss of **personally identifiable information** of **employees**; or
8. Infliction of emotional distress or mental anguish, but only if directly resulting from a peril described in 1. through 7. above.

**Security breach** means any of the following, whether a specifically targeted attack or a generally distributed attack:

1. **Unauthorized access** to, or **unauthorized use** of, an **insured computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from an **insured computer system** or from an **Insured**;
2. A **denial of service attack** against an **insured computer system**;
3. Infection of an **insured computer system** by **malicious code** or the transmission of **malicious code** from an **insured computer system**;
4. An event described in 1. through 3. above resulting from an **act of cyber terrorism**.

A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security will be considered a single **security breach** and will be deemed to have occurred at the time the first of such **security breaches** occurred.

**Special expenses** mean reasonable and necessary costs and expenses that **you** incur to:

1. Prevent, preserve, minimize, or mitigate any further damage to **digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants or forensic experts;
2. Preserve critical evidence of any criminal or malicious wrongdoing;
3. Purchase replacement licenses for **computer programs** because the copy protection system or access control software was damaged or destroyed by a **covered cause of loss**; or
4. Notify affected individuals of a total or partial interruption, degradation in service, or failure of an **insured computer system** resulting from a **covered cause of loss**.

**Special expenses** do not include:

1. The cost(s) of restoring, updating, or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
2. Physical damage to the **computer hardware** or **data** center other than accidental physical damage to, or destruction of, **electronic media** so that stored **digital assets** are no longer machine-readable;
3. Contractual penalties or consequential damages;
4. Any liability to **third parties** for whatever reason, including, but not limited to, legal costs and expenses of any type;
5. Fines or penalties imposed by law;
6. The economic or market value of **digital assets**;
7. Costs or expenses incurred to identify, patch, or remediate software program errors or **computer system** vulnerabilities;
8. Costs to upgrade, redesign, reconfigure, or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**;
9. Any loss rising out of a physical cause or natural peril, including, but not limited to, fire, wind, water, flood, subsidence, or earthquake; or

---

**All other terms and conditions of the Policy remain unchanged.**

10. The cost(s) of restoring, replacing or repairing **electronic media**.

**Takeover** means:

1. Any person, entity or affiliated group of persons or entities obtains more than 50% of the **Named Insured's** equity or assets; or
2. Any person, entity or affiliated group of persons or entities obtains the right to elect or appoint more than 50% of the **Named Insured's** directors, officers, trustees or member managers, as applicable; or
3. The **Named Insured** is dissolved, sold or acquired by, merged into, or consolidated with, another entity, such that the **Named Insured** is not the surviving entity; or
4. The **Named Insured** ceases to do business for any reason.

**Telecommunications fraud** means the intentional, unauthorized and fraudulent gaining of access to outgoing telephone service through infiltration and manipulation of an **insured telecommunications system**.

**Telecommunications fraud loss** means the charges that **you** incur for unauthorized calls directly resulting from **telecommunications fraud**.

**Third party**, whether singular or plural, means any entity, company, organization or person who does not qualify as an **Insured** under the Policy to which this Endorsement is attached.

**Unauthorized access** means the gaining of access to a **computer system** by any unauthorized person or persons.

**Unauthorized use** means the use of a **computer system** by any unauthorized person or persons or by any authorized person or persons in an unauthorized manner.

**Vicariously liable** means **your** legal responsibility for the liability of others, including legal responsibility **you** assume in a contract. The existence of vicarious liability will not create or confer any rights or duties under this Endorsement to any **third party**, other than as provided in this definition.

**Voluntary notification expenses** mean those reasonable and necessary legal expenses, forensic and investigation expenses, **public relations expenses**, postage expenses, and related advertising expenses that **you** incur to notify individuals of a **security breach** or **privacy breach** where there is no specific legal requirement in the applicable jurisdiction mandating such notice. **Voluntary notification expenses** are subject to the Underwriters' discretion and the **voluntary notification expenses sublimit**.

**Voluntary notification expenses sublimit** means the maximum amount that Underwriters will pay for **voluntary notification expenses**. The **voluntary notification expenses sublimit** is included within, and will erode, the Limits of Liability for Insuring Agreement D.

**Waiting Period** means the amount of time, as set forth in Item 3 of the Declarations, that must elapse before any loss or expenses may be payable under Insuring Agreement E or Insuring Agreement F. The **waiting period** applies to each **period of restoration** or **period of indemnity**.

**Wrongful act** means:

1. With respect to Insuring Agreement A, a **multimedia wrongful act**;
2. With respect to Insuring Agreement B, a **security and privacy wrongful act**;
3. With respect to Insuring Agreement C, a **security breach** or **privacy breach**; and
4. With respect to Insuring Agreement I, a **security breach** or **privacy breach**.

**You** and **Your** means the **Named Insured**.

---

**All other terms and conditions of the Policy remain unchanged.**

**Your privacy policy** means **your** published policies provided to **your employees** or **third parties** in written or electronic form that govern the collection, dissemination, confidentiality, integrity, accuracy or availability of information relating to **private information**.

**Your reputation** means the estimation of trust that customers or clients have in doing business with **you** or in purchasing **your** products or services.

### Part VI.    e-MD Notice Provisions

The following Notice Provisions will apply only to the coverage provided under this Endorsement and will supersede any other notice provisions contained elsewhere in the Policy.

**A.**    If any **claim** under Insuring Agreement A, B, C or I is made against any **Insured**, an **executive** must provide written notice to the Underwriters of such **claim** as soon as practicable, but no later than sixty (60) days after expiration of the **endorsement period** (or during the Extended Reporting Period, if applicable). A **claim** under Insuring Agreement A, B, C, or I will be deemed to be first made when it is received by an **Insured**.

**B.**    If **you** have any **claim** under Insuring Agreement D, E, F, G or H, an **executive** must provide written notice to the Underwriters of such **claim** as soon as practicable, but no later than sixty (60) days after expiration of the **endorsement period** (or during the Extended Reporting Period, if applicable). A **claim** under Insuring Agreement D, E, F, G, or H will be deemed to be first made when such written report is received by the Underwriters.

**C.**    If, during the **endorsement period**, an **executive** becomes aware of any incidents, acts, facts or circumstances that could reasonably be a basis for a **claim**, the **executive** must give written notice of the following information to the Underwriters during the **endorsement period**:

1.    Specific details of the incidents, acts, facts or circumstances that could reasonably be the basis for a **claim**;
2.    Possible **damages**, penalties, or other amounts potentially covered under this Endorsement that may result or has resulted from the facts or circumstances;
3.    Details regarding how the **executive** first became aware of the incidents, acts, facts or circumstances; and
4.    The **computer system** security and event logs, if applicable.

Any **claim** arising out of such reported incidents, acts, facts or circumstances will be deemed to be a **claim** first made on the date that Underwriters first receive written notice complying with the above requirements.

### Part VII.    e-MD Extended Reporting Provisions

If **you** purchase an Extended Reporting Period in accordance with the provisions of the Policy, such Extended Reporting Period will apply to the coverage provided under this Endorsement, but only if:

**A.**    With respect to Insuring Agreements A, B, C, and I:

1.    The **claim** is first made and reported to the Underwriters during the Extended Reporting Period; and
2.    The actual or alleged **wrongful acts** giving rise to such **claim** occur on or after the **retroactive date** and prior to the end of the **endorsement period**.

---

**All other terms and conditions of the Policy remain unchanged.**

**B.**     With respect to Insuring Agreements D, E, F, G and H:

1.   The **first party insured event** occurs on or after the **retroactive date** but prior to the end of the **endorsement period**; and
2.   The **first party insured event** is first discovered by an **Insured** and reported to the Underwriters during the Extended Reporting Period.

*Part VIII.     e-MD Exclusions*

The following exclusions will apply only to the coverage provided under this Endorsement. The exclusions that appear elsewhere in the Policy will not apply to this Endorsement.

The Underwriters will not be liable for any **claim**:

1.   Based upon, arising from, or in any way involving an actual or alleged **wrongful act** or **first party insured event** which took place, in whole or in part, prior to the **retroactive date**.

2    Based upon, arising from, or in any way involving an actual or alleged **wrongful act** or **first party insured event** of which any **Insured** had knowledge prior to the **endorsement period** or prior to the effective date of an Endorsement of which this Endorsement is a continuous renewal.

3.   Based upon, arising from, or in any way involving any **wrongful act** or **first party insured event** which was disclosed or reported to a previous insurer prior to the **endorsement period**.

4.   Made by or on behalf of an **Insured** against another **Insured**. This exclusion does not apply to an otherwise covered **claim** under Insuring Agreement B which is made by any past, present or future **employee** alleging a **security and privacy wrongful act**.

5.   Based upon, arising from, or in any way involving any of the following committed by an **Insured**, whether acting alone or in collusion with other persons:

   a.   A willful, intentional, deliberate, malicious, fraudulent, dishonest, or criminal act or omission;
   b.   Any intentional violation of law;
   c.   Any intentional violation of **your privacy policy**; or
   d.   The gaining of any profit or advantage to which an **Insured** is not legally entitled.

   This exclusion does not apply to **claim expenses** or the Underwriters' duty to defend any such **claim** until the conduct described in this exclusion has been established by a final adjudication in a judicial, administrative or alternative dispute proceeding, or by an **Insured's** own admission in a proceeding or otherwise. The Underwriters will have the right to recover **claim expenses** incurred in defending any such **claim** from those parties found to have committed the conduct described in this exclusion.

   This exclusion does not apply to any **Insured** that did not commit, participate in, or have knowledge of any conduct described in this exclusion.

6.   Based upon, arising from, or in any way involving activities of an **Insured** as a trustee, partner, officer, director, or employee of any trust, organization, corporation, company or business other than **your** trust, organization, corporation, company or business.

7.   Based upon, arising from, or in any way involving the insolvency or bankruptcy of any person or entity, or the failure, inability, or unwillingness of any person or entity to make payments, perform obligations or conduct business because of insolvency, liquidation, or bankruptcy.

8.   Based upon, arising from, or in any way involving **bodily injury**.

9.   Based upon, arising from, or in any way involving **property damage**.

---

**All other terms and conditions of the Policy remain unchanged.**

10. Based upon, arising from, or in any way involving:

    a. Satellite failures;
    b. Electrical or mechanical failures or interruption, including electrical disturbance, spike, brownout, or blackout; or
    c. Outages to gas, water, telephone, cable, telecommunication or other infrastructure, unless such infrastructure is under **your** direct operational control and unless such **claim** forms a part of an otherwise covered **first party insured event** under Insuring Agreement F.

11. Based upon, arising from, or in any way involving the wear and tear, drop in performance, progressive deterioration, or aging of electronic equipment or **computer hardware** or tangible property used by **you**.

12. Based upon, arising from, or in any way involving the failure of overhead transmission and distribution lines.

13. Based upon, arising from, or in any way involving the gradual deterioration of subterranean insulation.

14. Based upon, arising from, or in any way involving fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure, or any other physical event, however caused.

15. Based upon, arising from, or in any way involving coupons, prize discounts, prizes, awards, or any valuable consideration given that exceeds the total contracted or expected amount.

16. Based upon, arising from, or in any way involving the actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products or services.

17. Based upon, arising from, or in any way involving any cost guarantee, cost representation, contract price, or cost estimate being exceeded.

18. Based upon, arising from, or in any way involving the violation of any economic or trade sanctions by the United States government including, but not limited to, sanctions administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC). This exclusion does not apply to a **security breach** originating from any country where the United States of America has imposed economic or trade sanctions.

19. Based upon, arising from, or in any way involving any breach of any express, implied, actual or constructive contract, warranty, guarantee or promise. This exclusion does not apply to:

    a. Any liability or obligation an **Insured** would have had in the absence of such contract, warranty, guarantee or promise and which would have been insured by this Endorsement; or
    b. A breach of **your privacy policy**.

20. Based upon, arising from, or in any way involving any liability assumed by any **Insured** under a contract or agreement. This exclusion does not apply to:

    a. With respect to Insuring Agreement A and Insuring Agreement B only, liability **assumed under contract**;
    b. Any liability an **Insured** would have had in the absence of such contract or agreement and which would have been insured by this Endorsement; or
    c. With respect to Insuring Agreement I only, liability for **PCI DSS fines and assessments** assumed under a **merchant services agreement**.

21. Based upon, arising from, or in any way involving:

    a. Any actual, alleged or threatened presence of pollutants or contamination of any kind, including, but not limited to, asbestos, smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste (waste includes

---

**All other terms and conditions of the Policy remain unchanged.**

materials to be recycled, reconditioned, or reclaimed), whether such presence results from an **Insured's** activities or the activities of others, or such presence or contamination happened suddenly or gradually, accidentally or intentionally, or expectedly or unexpectedly; or

b. Any directive or request to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize pollutants, or in any way respond to, or assess the effects of, pollutants or contamination of any kind.

22. Based upon, arising from, or in any way involving the actual or alleged loss of value of any **securities**.

23. Based upon, arising from, or in any way involving **income loss** caused by, or resulting from, unauthorized trading. "Unauthorized trading" means trading, which at the time of the trade exceeds permitted financial limits or outside of permitted product lines.

24. Based upon, arising from, or in any way involving:

   a. The actual or alleged purchase or sale of **securities**;
   b. The offer of, or solicitation of an offer, to purchase or sell **securities**; or
   c. The violation of any securities law including, but not limited to, the provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, or the Sarbanes-Oxley Act of 2002, or any regulation promulgated under the foregoing statutes, or any similar federal, state, local, or foreign law, including "Blue Sky" laws, whether such law is statutory, regulatory, or common law.

25. Based upon, arising from, or in any way involving the actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as "Racketeer Influenced and Corrupt Organizations Act" or "RICO"), as amended, or any regulation promulgated under the foregoing statute, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law.

26. Based upon, arising from, or in any way involving the actual or alleged government enforcement of any state or federal regulation including, but not limited to, regulations promulgated by the United States Federal Trade Commission, Federal Communications Commission, or the Securities and Exchange Commission. This exclusion does not apply to an otherwise covered **claim** under Insuring Agreement C.

27. Based upon, arising from, or in any way involving:

   a. Any employer-**employee** relations, policies, practices, acts, or omissions;
   b. Any actual or alleged refusal to employ any person; or
   c. Any misconduct with respect to **employees**.

   This exclusion does not apply to an otherwise covered **claim** under Insuring Agreement B, Insuring Agreement C, or Insuring Agreement D.

28. Based upon, arising from, or in any way involving any workers' compensation or similar laws such as the Federal Employers Liability Act.

29. Based upon, arising from, or in any way involving any actual or alleged harassment or discrimination of any kind including, but not limited to, age, color, race, gender, creed, national origin, marital status, sexual preferences, disability, or pregnancy.

30. Based upon, arising from, or in any way involving:

   a. The violation of any pension, healthcare, welfare, profit sharing, mutual, or investment plans, funds, or trusts; or
   b. Any violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments, or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling, or order issued pursuant to the foregoing statutes.

31. Based upon, arising from, or in any way involving labor strikes or similar labor actions.

---

**All other terms and conditions of the Policy remain unchanged.**

32. For loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with war, invasion, acts of foreign enemies, hostilities or warlike operations (whether declared or not), civil war or mutiny, civil commotion assuming the proportions of, or amounting to, a riot, popular uprising, military uprising, insurrection, rebellion, revolution, or usurped power or act of terrorism, regardless of any other cause or event contributing concurrently or in any other sequence to the loss; or for loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any action taken by a government authority to hinder, control, prevent, suppress, or defend against any of the aforementioned actions; or the confiscation, nationalization, requisition, or destruction of, or damage to, property by, or under the order of, any government authority.

33. Based upon, arising from, or in any way involving any commercial decision by any **Insured** to cease providing a product or service, but only if the **Insured** is contractually obligated to continue providing such products or services.

34. Based upon, arising from, or in any way involving:

    a.  Gambling, pornography, prizes, awards, or coupons; or
    b.  The sale or provision of prohibited, restricted or regulated Items, including, but not limited to, alcoholic beverages, tobacco or drugs.

35. Based upon, arising from, or in any way involving:

    a.  Any **Insured's** failure to comply with or follow the **PCI Data Security Standard** or any payment card company rules; or
    b.  The implementation or maintenance of, or compliance with, any security measures or standards related to any payment card **data** including, but not limited to, any fine or penalty imposed by a payment card company on a merchant bank or payment processor that an **Insured** has paid or agreed to reimburse or indemnify.

    This exclusion does not apply to an otherwise covered **PCI DSS demand** under Insuring Agreement I.

36. Based upon, arising from, or in any way involving:

    a.  Any actual or alleged unfair competition, price fixing, deceptive trade practices or restraint of trade; or
    b.  The violation of any antitrust statute, legislation or regulation.

    This exclusion does not apply to allegations of unfair competition that form a part of an otherwise covered **claim** under Insuring Agreement A. This exclusion does not apply to allegations of deceptive trade practices that form a part of an otherwise covered **claim** under Insuring Agreement B.

37. Based upon, arising from, or in any way involving any actual or alleged infringement of any patent.

38. Based upon, arising from, or in any way involving the misappropriation, theft, copying, display or publication of any trade secret. This exclusion does not apply to an otherwise covered **claim** under Insuring Agreement B alleging failure to prevent the misappropriation of a trade secret which results from a **security and privacy wrongful act**.

39. Based upon, arising from, or in any way involving the manufacturing, mining, use, sale, installation, removal or distribution of, or exposure to, asbestos, materials or products containing asbestos, or asbestos fibers or dust.

40. Based upon, arising from, or in any way involving the confiscation, commandeering, requisition, destruction of, or damage to, **computer hardware** by order of a government de jure or de facto, or by any public authority for whatever reason.

---

**All other terms and conditions of the Policy remain unchanged.**

41. With respect to Insuring Agreement E (BrandGuard) only, for:

    a. Any loss, cost, liability or expense that **you** incur to re-establish **your reputation**, including **public relations expenses**;

    b. Any loss, cost, liability or expense incurred in any **claim** that is insured by any other insurance, except excess insurance;

    c. Any loss, cost, liability or expense incurred because of an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry, or **your** specific competitors without any specific allegations regarding a **security breach** or a **privacy breach** committed by an **Insured**, or by others acting on **your** behalf, for whom **you** are legally responsible, including **BPO service providers** or **outsourced IT service providers**;

    d. Any liability to **third parties** for whatever reason, including, but not limited to, legal costs and expenses of any type;

    e. Contractual penalties or consequential damages;

    f. **Notification expenses, breach support and credit monitoring expenses** or **privacy breach response costs** paid or payable under Insuring Agreement D; or

    g. Fines or penalties imposed by law or regulation.

42. Based upon, arising from, or in any way involving:

    a. Any actual, alleged or threatened presence, of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other micro-organisms of any type, nature or description;

    b. Any cost, expense, or charge, fine or penalty incurred or sustained, or imposed by order, direction, request, or agreement of any court, governmental agency, or any civil, public, or military authority, to test for, monitor, clean up, remediate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any way respond to, or assess, the effects of mold, mildew, spores, mycotoxins, fungi, organic pathogens, or other microorganisms of any type, nature, or description.

With respect to this exclusion, "organic pathogens" mean any organic irritant or contaminant including, but not limited to, mold, fungus, bacteria, virus, or their byproducts such as mycotoxins, mildew, or biogenic aerosol. "Organic pathogens" include, but are not limited to, Aspergillus, Penicillium, Stachybotrys Chartarum, Stachybotrys Atra, Trichoderma, Fusarium, and Memnoniella.

43. Based upon, arising from, or in any way involving the existence, emission, or discharge of any electromagnetic field, electromagnetic radiation, or electromagnetism, which actually or allegedly affects the health, safety, or condition of any person or the environment, or that affects the value, marketability, condition or use of any property.

44. Based upon, arising from, or in any way involving:

    a. ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel; or

    b. the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof.

45. Based upon, arising from, or in any way involving any actual or alleged violation of the Telephone Consumer Protection Act (47 U.S.C.§227), the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. §§ 6101-6108), or the CAN-SPAM Act (15 U.S.C. §§ 7701-7713), each as amended, or any regulations promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such laws are statutory, regulatory or common law, including any anti-spam law or other law concerning the use of telephonic or electronic communications for solicitation purposes, or any allegations of invasion or violation of any rights to privacy derived therefrom. This exclusion does not apply to an otherwise covered **claim** under Insuring Agreement B or Insuring Agreement C alleging a violation of the CAN-SPAM Act, as amended, or any regulations promulgated thereunder, or any similar federal, state, local or foreign law, whether such law is statutory, regulatory or common law, but only if such violation arises out of a **security breach**.

---

**All other terms and conditions of the Policy remain unchanged.**

46. With respect to Insuring Agreement H:

    a. Based upon, arising from, or in any way involving any actual or alleged unauthorized acquisition, access, use or disclosure of **private information** that is held or transmitted in any form.

    b. Based upon, arising from, or in any way involving the seizure, confiscation, nationalization, requisition, or destruction of an **insured telecommunications system** by, or under the order of, any government or public authority.

    c. For amounts that have been wholly or partially reversed by a credit card company or financial institution.

    d. Based upon, arising from, or in any way involving any fraudulent instruction, if the sender, or any person or organization acting in collusion with the sender, ever had authorized access to **your** password, PIN or other security code.

    e. Based upon, arising from, or in any way involving the giving or surrendering of **money**, **securities**, or **other property** in any exchange for or purchase of goods, products or services:

        i. That are not yet delivered, whether or not fraudulent; or

        ii. That fail to conform to advertised quality or performance; or

        iii. That fail to conform to the quality or performance expected from the standpoint of the **Insured**.

    f. Based upon, arising from, or in any way involving potential income, including interest and dividends, not realized by **you** or **your** customers.

Exclusion 46.a. does not apply to **financial fraud** which directly results from the use of **private information**.

Exclusion 46.d. does not apply to **financial fraud** which directly results from a fraudulent instruction transmitted by **your employee** or an **executive**, if the fraudulent instruction was transmitted because that **employee** or **executive** received intentionally misleading or deceptive telephonic or electronic communications from a **third party** falsely purporting to be **you** or **your** client, vendor, or **employee**.

## Part IX.  *Changes in Exposure*

**A.** In the event of a **takeover** during the **endorsement period**, coverage under this Endorsement will continue until its natural expiration date for any **claim** made during the **endorsement period**, but only if the actual or alleged **wrongful acts** or **first party insured events** giving rise to such **claim** occur on or after the **retroactive date** and prior to the effective date of the **takeover**.

**B.** If, after the inception of the **endorsement period**, the **Named Insured** acquires or creates another entity, business or operation, and the Underwriters have agreed, by endorsement to the Policy, to provide coverage for such new entity, business or operation, then the new entity, business or operation will be included within the definition of **Insured**, but only with respect to any **claim** for actual or alleged **wrongful acts** or **first party insured events** that occur after the effective date of the creation or acquisition of such new entity, business or operation.

**C.** If, after the inception of the **endorsement period**, the **Named Insured** sells an entity, business or operation, that entity, business or operation will be an **Insured**, but only with respect to **claims** for actual or alleged **wrongful acts** or **first party insured events** that occur on or after the **retroactive date** and prior to the effective date of the sale.

## Part X.  *Loss Determination*

**A. Brand Loss**. The **brand loss** payable under Insuring Agreement E will be calculated by considering:

    1. The prior experience of **your** business preceding the date of the **adverse media report** or **notification**, whichever applies, and **your** likely net profit, had no **adverse media report** been published or **notification** occurred;

    2. Income derived from substitute methods, facilities, or personnel **you** use to maintain **your** revenue stream;

3. **Your** documentation of the trends in **your** business and variations in, or other circumstances affecting, **your** business before or after the **adverse media report** or **notification**, which would have affected **your** business had no **adverse media report** been published or **notification** occurred; and

4. Any fixed operating expenses (including ordinary payroll), but only to the extent that such operating expenses must continue during the **period of indemnity**.

For purposes of calculating **brand loss**, "net profit" will include the amount of money paid or payable to **you** for goods, products, or services sold, delivered, or rendered in the normal course of **your** business.

**B.  Digital Assets Loss**.  The **digital assets loss** payable under Insuring Agreement **F.1**. will be determined as follows:

1. If the impacted **digital asset** was purchased from a **third party**, we will pay only the lesser of the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**.

2. If it is determined that the **digital assets** cannot be replaced, restored or recreated, we will only reimburse the actual and necessary **digital assets loss** incurred up to such determination.

**C.  Income Loss**.  The **income loss** payable under Insuring Agreement **F.2**. will be calculated as follows:

1. **Your** net profit, as could have been reasonably projected, but which has been lost as a direct result of a **covered cause of loss**; plus

2. Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

**Income loss** will be calculated by considering:

1. The prior experience of **your** business preceding the date of the **covered cause of loss**, and **your** likely net profit, had no **covered cause of loss** occurred;

2. Income derived from substitute methods, facilities, or personnel **you** use to maintain **your** revenue stream; and

3. **Your** documentation of the trends in **your** business and variations in, or other circumstances affecting, **your** business before or after the **covered cause of loss**, which would have affected **your** business had no **covered cause of loss** occurred.

For purposes of calculating **income loss**, "net profit" will include the amount of money paid or payable to **you** for goods, products, or services sold, delivered, or rendered in the normal course of **your** business.

This endorsement is to take effect on March 9, 2018.

| | |
|---|---|
| Policy No.: | ME100504 |
| Name: | CMGK, LLC dba: Massage Envy |
| Policy Effective Date: | March 9, 2018     Expiration:   March 9, 2019 |
| Endorsement No.: | 14 |

**All other terms and conditions of the Policy remain unchanged.**

 

**NFP**
Property and
Casualty Services, Inc.

## BASIC INFORMATION:

Named Insured: <u>CMGK LLC</u>                                  DBA: <u>Massage Envy</u>

Loss Control Contact Name: <u>Gus Khalifa</u>          Phone: ████████         Fax: _____

Website Address: <u>www.massageenvy.com</u>          Email Address: ████████

Mailing Address: ████████

Physical Address: _____

Type of Entity: ☐ Corporation ☐ Individual ☐ Partnership ☐ Joint Venture ☒ LLC

Date business started under current ownership: <u>03/09/2014</u>

Does the applicant own/operate any other businesses? If so, describe _____

Proposed Effective Date: <u>03/09/2018</u>

Current Carrier & Limits of Liability: _____

Is this policy being non-renewed: ☐ YES ☒ NO

Any policy or coverage declined, cancelled or non-renewed during the prior 3 years? N/A in Missouri. ☐ YES ☒ NO

Have you had any bankruptcies? ☐ YES ☒ NO

### List all losses in the past 5 years whether or not insured (Attach additional sheet if necessary):

| Date of Claim | Description of Claim | Open/Closed | Paid $ | Reserve $ |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

## LIABILITY LIMITS & COVERAGE

**Professional Liability -** $1,000,000 Occ/$3,000,000 Agg Included

☒ $2,000,000 /$4,000,000  ☐ $1,000,000 /$2,000,000  ☐ $500,000 /$1,000,000
☐ $300,000 /$600,000  ☐ $100,000 /$300,000

**Abuse Liability Limit** (choose one): ☒ $1,000,000/$2,000,000  ☐ Other $_____

 **Massage Envy**

 **NFP** Property and Casualty Services, Inc.

(A Copy of this Page is Required for Each Additional Location)

**PROPERTY LIMITS AND COVERAGE** – (If applicable)

Location #:          1

Address:          278 Consumer Sq. Mays Landing , NJ 08330

Square Footage:          4200.00

Do you own the building at this location?        ☐ Yes        ☒ No

| | | | |
|---|---|---|---|
| Annual Revenue: | ███████████ | Number of Annual Services: | _____ |
| Number of Massage Therapists: | Full Time:  13 | Part Time: | _____ |
| Number of Massage Beds: | _____ | | |
| Number of Estheticians: | Full Time: _____ | Part Time: | _____ |
| Number of Rooms: | _____ | | |

 

## Additional Insured Schedule

Location # 1

Name:   Massage Envy Franchising, LLC; Massage Envy LLC      [X] Additional Insured   [ ] Loss Payee

Address:   14350 N 87th St. Ste 200      City:  Scottsdale      State:  AZ   Zip:  85260

**FRAUD WARNINGS**

**GENERAL FRAUD STATEMENT** (not applicable in Colorado, Hawaii, Nebraska, Ohio, Oklahoma, Oregon, Utah and Vermont) Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and (NY: substantial) civil penalties. In the District of Columbia, Louisiana, Maine, Tennessee and Virginia, insurance benefits may also be denied.

**NOTICE TO COLORADO APPLICATIONS: THIS NOTICE IS A PART OF YOUR APPLICATION FOR PROFESSIONAL LIABILITY INSURANCE**: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**NOTICE TO HAWAII APPLICANTS**: For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment or both.

**NOTICE TO OHIO APPLICANTS**: Any person who, with intent to defraud or knowing that he/she is facilitation a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO OKLAHOMA APPLICANTS**: WARNING: A person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO UTAH APPLICANTS**: For your protection, Utah law requires the following to be included in this application: "Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report for billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison.

THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN ARE TRUE. THE APPLICANT AGREES THAT IF THE INFORMATION SUPPLIED ON THE APPLICATION BY THE APPLICANT CHANGES BETWEEN THE DATE OF THE APPLICATION AND THE EFFECTIVE DATE OF INSURANCE, APPLICANT WILL IMMEDIATELY NOTIFY THE COMPANY OF SUCH CHANGES AND THE COMPANY MAY WITHDRAW OR MODIFY ANY OUTSTANDING QUOTATIONS AND/OR AUTHORIZATION OR AGREEMENT TO BIND THE INSURANCE.

This application is understood to be an inducement to the issuance of a policy of insurance by the Company. The undersigned hereby authorizes the Company to obtain information necessary for evaluation in determining acceptability including but not limited to motor vehicle reports, credit reports and physical inspection.

<u>**No person or entity proposed for coverage is aware of any fact, circumstance, or situation which he or she has reason to suppose might give rise to any claim that would fall within the scope of the proposed Coverage.**</u>

**Acceptance of Professional Liability Claims Made Coverage Form**

<u>**This Claims Made policy applies only to those claims arising from covered incidents which occur on or after the stated retroactive date.  In addition, the claim must first be made and reported to the company during the policy period or applicable extended reporting period.**</u> _____ initials

Applicant's Signature: _____     Date: _____3.15.18_____

Producer's Signature
(Only applicable if using a
producer)         _____     Date: _____

Producer's License Number: _____     Exp Date: _____


16501 Ventura Blvd. Suite 200 Encino, CA 91436
LIC #0677191 · NASinsurance.com

The following is the 2018 breakdown of Lloyd's Syndicates

**Contract No. B6089PRW181861** (effective 1/1/2018 – 1/1/2019)

| Percentage | Lloyd's Syndicate | Pseudonym |
|---|---|---|
| 26.67% | 510 | KLN - Tokio Marine Kiln |
| 20.00% | 4141 | HCC - Tokio Marine HCC |
| 53.33% | 1880 | TMK - Tokio Marine Kiln |
| 100.00% | | |

The following is the 2018 breakdown of Lloyd's Syndicates for **Cyber Liability Insurance (also known as e-MD®)**

**Contract No. B6089PRW181861** (effective 1/1/2018 – 1/1/2019)

| Percentage | Lloyd's Syndicate | Pseudonym |
|---|---|---|
| 36.00% | 510 | KLN - Tokio Marine Kiln |
| 20.00% | 4141 | HCC - Tokio Marine HCC |
| 44.00% | 1880 | TMK - Tokio Marine Kiln |
| 100.00% | | |

# Lloyd's
# London



# EXHIBIT  B

**LAFFEY, BUCCI & KENT LLP**
BY:    Brian D. Kent, Esquire, Attorney ID: 041892004
         V. Paul Bucci, II, Esquire (Admitted Pro Hac Vice)
         M. Stewart Ryan, Esquire, Attorney ID: 019492012
371 Hoes Ln #200
Piscataway, NJ 08854
(215) 399-9255
Fax (215) 241-8700
*Attorneys for Plaintiff*

| | |
|---|---|
| Jane Doe M.N. (a fictitious name), <br> c/o Laffey, Bucci & Kent LLP <br> 371 Hoes Ln #200 <br> Piscataway, New Jersey 08854 <br> Plaintiff, <br><br> v. <br><br> Massage Envy Franchising, LLC <br> 14350 North 87th Street, Suite 200 <br> Scottsdale, AZ 85260 <br><br> and <br><br> CMGK, LLC d/b/a <br> Massage Envy Mays Landing <br> 278 Consumer Square <br> Mays Landing, NJ  08330 <br><br> and <br><br> ABC, INC, 1 – 10 (fictitious entities) <br><br> and <br><br> JOHN DOES 1 – 10 (fictitious persons), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> ATLANTIC COUNTY <br><br><br> Civil Action <br><br><br> DOCKET NO.: <br><br> **COMPLAINT AND JURY DEMAND** |

## <u>CIVIL ACTION COMPLAINT</u>

The Plaintiff, Jane Doe M.N., files this complaint against Defendants, Massage Envy

Franchising, LLC, CMGK, LLC d/b/a Massage Envy Mays Landing, ABC, Inc. 1-10 (fictitious

entities), and John Does 1-10 (fictitious persons) alleging as follows:

1.      Plaintiff, Jane Doe M.N., is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below.  Information which would or could identify Jane Doe M.N. is not contained herein.  Plaintiff may be contacted through her counsel as outlined herein.

2.      There exists good cause for Plaintiff to use a pseudonym due to the harmful effect of the public disclosure of her identity and the harm inflicted by the Defendants to Jane Doe M.N., Plaintiff's undersigned counsel will provide the identity of Plaintiff to all Defendants.  As such, Defendants suffer no prejudice as a result of concealing Plaintiff's identity in the Complaint and Verification.

3.      Defendant, Massage Envy Franchising, LLC (hereinafter referred to as "Massage Envy"), is an Arizona corporation with its principal place of business located in Scottsdale, Arizona.  Massage Envy is a massage and spa therapy franchise with approximately 1,179 franchises located across the United States and is the largest employer of massage therapists nationwide. It is also believed and therefore averred that Massage Envy owns, operates, controls, manages, and/or does business as CMGK, LLC d/b/a Massage Envy Mays Landing.

4.      Defendant, CMGK, LLC d/b/a Massage Envy Mays Landing (hereinafter referred to as "Mays Landing"), is a New Jersey corporation with its principal place of business located at 278 Consumer Square, Mays Landing, NJ 08330.  Mays Landing, together with Massage Envy, owns, operates, controls, manages and/or does business as Massage Envy Spa located at 278 Consumer Square, Mays Landing, NJ 08330 (hereinafter referred to as "Massage Envy Mays Landing"), a day spa that offers massages and other spa services.

5.      Defendants ABC, Inc. 1-10 are fictitious entities that own, operate, control, manage or do business as Massage Envy Mays Landing and/or employed, supervised, controlled and/or

oversaw Steffon Davis and/or which otherwise owed a legal duty to Plaintiff to prevent the incident of sexual abuse at Massage Envy locations as is more fully alleged herein.

6.    Defendants John Does 1-10 are fictitious persons who own, operate, control, manage or do business as Massage Envy Mays Landing and/or employed, supervised, controlled and/or oversaw Steffon Davis and/or which otherwise owed a legal duty to Plaintiff to prevent the incident of sexual abuse at Massage Envy locations as is more fully alleged herein.

## INTRODUCTION

7.    Massage Envy, the first and by far the largest chain of massage franchises in the country, boasts a billion-dollar business that falsely promises safety in the treatment room for massage and spa services at an affordable price. Massage Envy not only failed to provide basic safety to clients in a most vulnerable setting, but it systemically and intentionally conspired and concealed the rampant problem of massage therapists at Massage Envy franchise locations sexually assaulting customers throughout the country, including within the State of New Jersey. Massage Envy's policy of telling staff to "not go to police" was singularly designed to continue its profit and protect the brand at the expense of the safety of unsuspecting customers. In furtherance of their conspiracy, the Defendants actively sought to conceal the knowledge and danger of customers being sexually assaulted within their business locations by actively preventing sexual assault reports from being reported to law enforcement and/or state massage therapy boards. According to at least one former employee:

> "[The internal review policy] is not in place to protect the client. It's in place to protect the company. It's centered around defusing the situation so the client doesn't call the police. You don't want cop cars showing up at your location the next day."

8.      Contrary to the CEO's, Joseph C. Magnacca, declaration to the public of a "Commitment to Safety," the Defendants have deceived the public regarding the dangers of its services and its knowledge of therapists' sexual assaults on customers and are, in fact, engaging in a continuous and repeated pattern to keep sexual assault claims "in-house" and from law enforcement, state massage therapy boards, unsuspecting customers and the public at large. According to a former corporate employee, the company's leadership has long feared the media would realize the national scope of the problem. That person recalled executives discussing what would happen "if someone connects the dots of how many sexual assaults have occurred across the country." In at least one risk management training, franchisees were told the goal when investigating claims is "to avoid police and keep membership."

9.      Assaults have consisted of rape, digital and oral penetration of the vaginal and anal area, touching of the genitals, touching of the breasts as well as therapists placing their genitals on customers' bodies. As a result, a culture of not only tolerating sexual assaults has occurred at Massage Envy franchise locations, but women continue to be and will in the future be sexually assaulted as a result of the Defendants' inexplicable, deceptive actions.  Due to the actions of Defendants' intentional actions to conspire and conceal the assaults, it has deceived hundreds of women into believing they were purchasing a safe service from the Defendants. This lawsuit is about a woman in the State of New Jersey who has fallen victim to the deceptive practices of the Defendants that resulted in her victimization at the hands of Massage Envy therapists. Jane Doe M.N. bravely proceeds in this Court in a quest to put an end to the cover-up described above and below so that no additional women in the State of New Jersey (or elsewhere) suffer what the Plaintiff has and will continue to endure for the rest of her life.

10.      Upon information and belief, sexual assaults committed by massage therapists at Massage Envy franchise locations is an epidemic of national scale with at least 180 allegations of

sexual assaults by Massage Envy therapists occurring across the country. However, the exact number of sexual assaults by Massage Envy therapists on customers known to the Defendants is believed to be well in excess of 180.

11.     Upon information and belief, Massage Envy's incomprehensible policy and procedure of directing franchisees to conceal reports of allegations of sexual assaults involving Massage Envy massage therapists and directing franchisees not to report said allegations to local law enforcement and/or state massage therapy boards enables the assaults to occur on a national level.

12.     Upon information and belief, Massage Envy has engaged in directing franchisees in the State of New Jersey not to report allegations of sexual assaults to local law enforcement and/or state massage therapy boards in order to protect the brand and help ensure profits are not adversely affected.

13.     Upon information and belief, Massage Envy company protocol in fact encourages employees to handle any allegations of sexual assault by Massage Envy massage therapists "in-house."

14.     Upon information and belief, Massage Envy protocol instructs franchisees to put customers who have a complaint in a private room and to avoid admitting to anything or making any promise to do anything more other than to internally investigate the matter, then to create an incident report and send it to the Corporate office in Arizona.

15.     As such, upon information and belief, Massage Envy has created a procedure wherein a woman who is sexually victimized is sent out the door of a Massage Envy franchise with only the promise to investigate and take appropriate action.

16.     Upon information and belief, in numerous cases involving sexual assaults at Massage Envy franchise locations by Massage Envy massage therapists, Massage Envy therapists

were allowed to remain employed and/or were transferred and/or hired/re-hired at other locations, only to go on to sexually assault another, if not multiple, female customers.

17.     The sexual assault described herein occurred on a massage table, on the premises operated and/or controlled by Defendants.

18.     The sexual assault described above and below occurred during normal business hours of Defendants and occurred in the course and scope of the performance of duties of Defendants' massage therapist.

19.     It is also believed and therefore averred that, consistent with Massage Envy policy and procedure, Massage Envy informed and directed the employee(s) not to report the assault to the New Jersey Board of Massage and Bodywork Therapy and/or law enforcement personnel but rather to handle the matter "in-house."

20.     As a result, it is believed and therefore averred that no one from Defendants or any employee(s) of Defendants reported any of the below mentioned assaults to the New Jersey Board of Massage and Bodywork Therapy, law enforcement or anyone outside of Defendants for that matter.

21.     Instead, it is believed and therefore averred that Defendants chose not to conduct any meaningful investigation whatsoever into the report of Defendants' employees or agents sexually assaulting Plaintiff, allowing other potential and future victims to sustain similar abuse or worse like so many other unsuspecting female customers of Massage Envy.

22.     Moreover, at no point did anyone from Defendants inform and/or warn any female customers of the known prior assaults committed by Defendants' massage therapists.

23.     In fact, employee(s) at Defendants unfathomably *recommended* Defendants' agents or employees to unknowing female customers after they knew Defendants' agents or employees had already sexually assaulted at least one client at that location.

24.     At all times relevant hereto, Defendants authorized and entrusted its employees and/or agents to have skin-to-skin contact with Plaintiff's body and to be alone with Plaintiff while Plaintiff was undressed and in a vulnerable position.

25.     Defendants' agent and/or employee was aided in his commission of the sexual assault of Plaintiff described more fully below by virtue of his duties as a massage therapist because Plaintiff was already undressed in a private room and in a vulnerable position per the protocol of massage clients at Massage Envy franchises.

26.     The sexual assault of Plaintiff described below occurred on a massage table, on the premises operated and/or controlled by Defendants.

27.     The sexual assault of Plaintiff described below occurred during normal business hours of Defendants and occurred in the course and scope of the performance of duties of Defendants' agent and/or employee while he was making skin-to-skin contact with Plaintiff's body.

28.     Defendant Massage Envy controls the day to day operations of its franchisees, including, but not limited to, the other Defendants in this case. As such, it is vicariously liable for the acts and/or omissions of its franchisees in this case.

29.     Moreover, Defendants have ratified the conduct of massage therapists sexually assaulting women at Massage Envy franchise locations. As such, all Defendants are vicariously liable for the acts of all employees and/or agents at the franchise locations at issue, including, but not limited, the perpetrator who committed the assault on Plaintiff.

## FACTS COMMON TO ALL CAUSES OF ACTION

30.     On or about September 23, 2017, Jane Doe M.N. was scheduled to receive a massage at Massage Envy Mays Landing.

31.     Jane Doe M.N. had not received massage services at this location previously.

32.     Jane Doe M.N., who has experienced chronic pain and was seeking assistance with a shoulder injury, contacted Massage Envy Mays Landing and inquired about an upper body massage. She was told that full body massages were only available.

33.     When Jane Doe M.N. arrived at Massage Envy Mays Landing, an individual named Steffon Davis (hereinafter "Davis") was assigned to massage her.

34.     At all times relevant hereto, Defendants authorized and/or entrusted Davis to have skin-to-skin contact with female customers and to be alone with them while the customers were undressed and in a vulnerable position.  Davis was aided in his commission of the sexual assault described more fully above and below by virtue of his duties as a massage therapist because Jane Doe M.N. was already undressed in a private room in a vulnerable position per the protocol of massage clients at Massage Envy franchises, including, but not limited to, Massage Envy Mays Landing.

35.     The sexual assault described herein occurred on a massage table, on the premises operated and/or controlled by Mays Landing and/or Massage Envy.

36.     The sexual assault of Jane Doe M.N. occurred during normal business hours of Massage Envy Mays Landing and occurred in the course and scope of the performance of duties of Davis while he was making skin-to-skin contact with female customers' bodies, including Jane Doe M.N.

37.     At all times relevant herein, Davis was an employee, agent, and/or servant of Defendants Mays Landing and/or Massage Envy.  Defendants, Mays Landing and Massage Envy, are liable for the harm to Jane Doe M.N. resulting from the conduct of their employee, agent and/or servant because Defendants knew or should have known their massage therapist's unfitness and propensities at the time of his hire and prior to his assault on Jane Doe M.N..

38.     As the massage progressed Jane Doe M.N. became concerned that Davis was not properly trained. Davis did not notify Jane Doe M.N. when he would proceed to the next area of Jane Doe M.N.'s body. While Jane Doe M.N. was lying face down she felt his erect penis brush against her body.

39.     Despite her presenting with a shoulder injury, Davis massaged her legs and worked his way up to her thighs. As Davis massaged one leg he repeatedly rubbed against her vaginal area and ultimately penetrated Jane Doe M.N.'s vagina with his finger. Davis moved Jane Doe M.N.'s underwear so as to achieve this act of penetration.

40.     Davis also massaged her other leg and engaged in the same conduct. He repeatedly rubbed against her vaginal area and ultimately penetrated Jane Doe M.N.'s vagina with his finger.

41.     During the course of the massage Jane Doe M.N. was asked to turn over by Davis and Davis did not keep her properly covered. When Davis replaced the cover he left her breasts exposed. Davis then massaged Jane Doe M.N.'s exposed breasts. Davis was extremely close to Jane Doe M.N., such that she could feel him breathing on her neck and his chin touching her forehead. Davis cupped her breast. Davis also took Jane Doe M.N.'s hand and placed it in his lap.

42.     As the massage progressed Davis became more physically aggressive. Davis applied significant pressure to Jane Doe M.N.'s back. While Davis was massaging her shoulders he wrapped his hands around her neck choking her, causing her to cough.

43.     Jane Doe M.N. was terrified during the massage. She froze and was unable to stop Davis from physically or sexually assaulting her. After the massage concluded, Jane Doe M.N. left Massage Envy Mays Landing.

44.     Upon information and belief, Davis has an extensive criminal history. Upon further information and belief, Davis was never properly licensed by the State of New Jersey.

45.     Upon further information and belief, Davis had previously been the subject of a complaint made by a female employee of Massage Envy Mays Landing. Specifically, the manager of Massage Envy Mays Landing, April Pippin, told police that she had received a complaint from a prior customer involving Davis. This prior customer reported to another massage therapist at Massage Envy Mays Landing that Davis had touched her genitals during a massage. Pippin told police this allegedly occurred on July 1, 2016.

46.     Despite all of this, Davis was permitted to be alone with vulnerable females and to sexually assault them.

## MASSAGE ENVY'S FAILURES AND STRATEGIES

47.     Defendant, Massage Envy, owed a duty to female customers, including, Plaintiff, to provide a reasonably safe environment for her, to ensure her safety, and to provide reasonably necessary supervision and oversight for her safety and welfare while at Massage Envy franchise locations, including Massage Envy Mays Landing. Mays Landing, owed the same duty to female customers, including Plaintiff, at Massage Envy Mays Landing.

48.     As set forth in this Complaint, Defendants failed to fulfill their legal duty to provide a reasonably safe environment for female customers at Massage Envy franchise locations, including CMGK, LLC d/b/a Massage Envy Mays Landing.

49.     Defendant, Massage Envy, had a duty to take reasonable steps to ensure that massage therapists at Massage Envy franchise locations were psychologically fit to provide massage therapy services to female customers at their franchise locations, including Massage Envy Mays Landing. Defendant, Massage Envy Mays Landing, owed the same duty to female customers at Massage Envy Mays Landing.

50.     As set forth in this Complaint, Defendant, Massage Envy, failed to fulfill their legal duty to ensure that massage therapists were psychologically fit to provide massage therapy services

to female customers at their franchise locations, including Massage Envy Mays Landing. Defendant, Massage Envy Mays Landing, failed to provide the same duty to female customers at Massage Envy Mays Landing.

51.     As a result, upon information and belief, numerous women nationwide, including throughout the State of New Jersey, have been sexually assaulted by massage therapists at Massage Envy franchise locations and Defendants did not report these assaults to police or to other public authorities, including, but not limited to, assault(s) pertaining to Davis.

52.     As a result of Defendants' negligent, careless, reckless, and intentional acts and omissions, numerous women, including Plaintiff, were sexually assaulted by depraved predators who exploited their position as massage therapists to violate innocent and unsuspecting women.

53.     As set forth in this Complaint, Defendants failed to take reasonable steps to ensure that massage therapists at Massage Envy locations, including Massage Envy Mays Landing, were psychologically fit to provide massage therapy services to unsuspecting, vulnerable female customers. As a direct result of Defendants' tortious acts and omissions, Plaintiff suffered the injuries set forth in this Complaint.

54.     In fact, Defendants knowingly permitted massage therapists to be employed, retained, rehired, and/or assigned who they knew and/or had reason to know, were psychologically unfit to provide massage therapy services to unsuspecting, vulnerable female customers. As a direct result of Defendants' acts, Plaintiff suffered the injuries set forth in this Complaint.

55.     Defendants employed, retained, transferred, re-hired and/or assigned massage therapists who it knew or should have known were sexual predators and/or mentally ill.

56.     Defendants failed to take reasonable steps to ensure that massage therapists at their Massage Envy franchise locations were psychologically fit to provide massage therapy services to unsuspecting, vulnerable female customers. These failures included the following:

a.   Failure to investigate the backgrounds of massage therapists in the employ or service of the Defendants;

b.   Failure to prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be sexual predators;

c.   Failure to reasonably and properly investigate allegations of sexual assault;

d.   Failure to properly train and instruct investigators;

e.   Failure to have in place standards of acceptable and unacceptable conduct;

f.   Failure to formulate, effectuate, and enforce policies to prevent and/or minimize the risk of sexual assaults to female customers by agents, servants, and/or employees of the Defendants;

g.   Failure to designate competent investigators to evaluate complaints of sexual assault;

h.   Failure to have in place standards for reporting acts of sexual misconduct to law enforcement authorities; and

i.   Failure to have in place standards for reporting acts of sexual misconduct to public officials and/or state massage therapy boards.

57.   Defendants had a duty to take reasonable steps to ensure that massage therapists whose duties placed them in close proximity to unsuspecting female customers were psychologically fit to perform those duties without jeopardizing the safety of said women.

58.   Defendants had a duty to take reasonable steps to supervise the actions of their massage therapists while providing services to female customers at Massage Envy franchises.

59.   Defendants failed to take reasonable steps to ensure that Davis was psychologically fit to provide massage therapy services to female customers at Massage Envy franchise locations, including, Massage Envy Mays Landing, after the Defendants knew, and/or should have known, of the dangers posed by Davis. As a direct result of the Defendants' acts, Plaintiff suffered the injuries set forth in this Complaint.

60.     Defendants' wrongdoing, however, did not stop there. Upon information and belief, Defendants employed deliberate strategies to conceal known sexual assaults by massage therapists in the employ or service of Defendants. These strategies included the following:

a.     Conducting sham investigations which were designed to avoid establishing culpability of massage therapists accused of sexual assault;

b.     Failing to interview witnesses or persons who possessed, or may have possessed, information which might tend to establish the guilt of an accused massage therapist;

c.     Routinely transferring, assigning and/or re-hiring massage therapists suspected of sexually assaulting female customers to and/or at other Massage Envy locations;

d.     Purposefully failing to inform customers of the acts of sexual misconduct and/or allegations of same, despite circumstances which gave rise to a duty to disclose such information and in fact, recommending massage therapists who were known to have assaulted female customers;

e.     Knowingly harboring sexual predators that were suspected and/or accused of sexual misconduct;

f.     Purposefully refusing to notify law enforcement and/or state massage therapy board officials when there existed reasonable grounds to believe that a massage therapist had engaged in improper sexual conduct with a female customer; and

g.     Directing local franchisees not to report allegations of sexual abuse.

61.     Defendants outrageously employed these strategies knowing that they exposed female customers, including Plaintiff, to a significant risk of serious physical and psychological harm, including a significant risk of sexual assault.  Defendants' actions were willful, malicious, wanton, outrageous, abhorrent, abominable, revolting, vile, and unconscionable because Defendants were motivated by a desire to protect themselves at the expense of female customers who would foreseeably be sexually assaulted.

## CAUSES OF ACTION

## COUNT I –VICARIOUS LIABILITY
## PLAINTIFF v. ALL DEFENDANTS

62.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

63.     Davis engaged in unpermitted, harmful and offensive sexual conduct and contact upon the person of Plaintiff in violation of New Jersey State law. Said conduct was undertaken while Davis was an employee and agent of Defendants, while in the course and scope of employment with Defendants, and/or was ratified by Defendants.

64.     Prior to the assault alleged above, upon information and belief, Defendants knew, had reason to know, or were otherwise on notice of the unlawful sexual conduct of Davis and/or other massage therapists at franchise locations nationwide. Defendants failed to take reasonable steps and failed to implement reasonable safeguards to avoid acts of unlawful sexual conduct in the future Davis, including, but not limited to, preventing or avoiding placement of Davis in functions or environments in which contact with female customers in vulnerable positions was an inherent part of those functions or environments. Furthermore, at no time during the periods of time alleged did the Defendants have in place a system or procedure to supervise and/or monitor employees, representatives or agents to ensure they did not sexually assault female customers at franchise locations.

65.     Moreover, incidents of sexual predators and/or mentally ill individuals in Massage Envy's service or employment were neither isolated nor unusual.

66.     Upon information and belief, Massage Envy has, for years, failed to reprimand, punish, report, or otherwise sanction massage therapists which it knew or had reason to know were sexual predators and/or mentally ill, including, but not limited to Davis.

67.     Massage Envy's knowing acquiescence and silence with respect to the known, or reasonably knowable, activities of sexual predators and/or mentally ill individuals, including, but

not limited to, Davis, constituted a course of conduct through which acts of sexual perversion and the violation of female customers were condoned, approved, and effectively authorized.

68.     Through its failure to timely reprimand and sanction the acts referenced herein, and for all of the other reasons set forth in this Complaint including, without limitation, its failure to take the steps necessary to prevent the occurrence of such reprehensible acts, Defendants ratified said actions and, accordingly, are vicariously liable for the actions of Davis.

69.     As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

70.     In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT II - NEGLIGENCE
## PLAINTIFF v. MASSAGE ENVY

71.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

72.     Defendant, by and through their agents, servants and employees, knew or reasonably should have known of Davis's dangerous and exploitive propensities and/or that Davis was an unfit agent. It was foreseeable that if Defendant did not adequately exercise or provide the duty of care owed to female customers in their care, including Plaintiff, they would be vulnerable to sexual assaults by massage therapists, including Davis.

73.     Prior to the sexual assault of Plaintiff, as set forth in this Complaint, Defendant knew that there were more than 180 allegations of sexual assaults by Massage Envy therapists occurring across the country.

74.     Defendant knew, and/or should have known, that those individuals who had sexually assaulted female customers, including Davis, were likely to commit further acts of sexual assault.

75.     Defendant owed to the public in general, and to Plaintiff in particular, a duty to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who it knew, or should have known, were sexual predators in its service and employ.

76.     Defendant owed to the public in general, and to Plaintiff in particular, a duty to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in its service and employ.

77.     Having been in the care of Defendant at the time under circumstances such as to deprive Plaintiff of her entitlement to safe care and protection, the Defendant owed to Plaintiff a duty to aid and/or protect her and to control the actions of third parties, as set forth in Restatement (Second) of Torts §§ 314A(4), 315.

78.     Having been in the care of Defendant at the time under circumstances such as to deprive Plaintiff of her normal opportunities for protection, the Defendant owed to Plaintiff a duty to control the acts of its agents, servants, and/or employees.

79.     At all times relevant hereto, Defendant did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify (and deal with) sexual predators.

80.     Despite actual knowledge of multiple instances in which sexual predators were employed, transferred, re-hired and/or assigned to positions within Massage Envy franchise locations and despite the foreseeable risk that said sexual predators would engage in repeated acts of sexual perversion and assault, Defendant did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify, and deal with sexual predators.

81.     At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures for the removal of sexual predators in the employ and/or service of Defendant.

82.     At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to criminal authorities sexual predators in the employ and/or service of Defendant.

83.     At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to state boards of massage therapy the presence of sexual predators in the employ and/or service of Defendant.

84.     As set forth in this Complaint, Defendant failed to fulfill its legal duty to protect Plaintiff and other female customers from the depraved and vile acts of its massage therapists, including Davis.

85.     As set forth in this Complaint, Defendant failed to take reasonable steps to ensure that massage therapists at Massage Envy franchise locations were psychologically fit to provide massage therapy services to female customers. These failures included the following:

    a.    Failure to investigate the background of massage therapists in its employ or service;

    b.    Failure to prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be sexual predators;

    c.    Failure to reasonably and properly investigate allegations of sexual assault;

    d.    Failure to properly train and instruct investigators;

    e.    Failure to have in place standards of acceptable and unacceptable conduct;

    f.    Failure to designate competent investigators to evaluate complaints of sexual assault; and

    g.    Failure to have in place standards for reporting acts of sexual misconduct to law enforcement authorities and/or state boards of massage therapy.

86.     Moreover, the negligent, reckless, intentional, outrageous, deliberately and recklessly indifferent and unlawful conduct of Defendant, as set forth above and herein, further consisted of:

    a.    permitting massage therapists, including Davis, to sexually assault female customers, including Plaintiff;

    b.    permitting massage therapists, including Davis, to engage in illegal sexual conduct with female customers, including Plaintiff, on the premises of Massage Envy franchise locations, including Massage Envy Mays Landing, during operating hours;

    c.    permitting Davis to violate New Jersey criminal statutes N.J.S.A. 2C:14-2 and 2C:14-3;

    d.    failing to properly and adequately supervise and discipline its employees to prevent the sexual assault that occurred to Plaintiff;

    e.    failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of female customers who engaged the services of Defendant, including Plaintiff, and, in the alternative, failing to implement and comply with such procedures which had been adopted;

    f.    failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of female customers, including Plaintiff;

    g.    creating an environment that facilitated sexual assault by Davis on Plaintiff;

    h.    failing to adopt, enforce and/or follow policies and procedures to protect female customers against harmful contact by its massage therapists, including Davis;

    i.    breaching the duties imposed by Restatement (Second) of Torts, § 324A, as adopted in New Jersey;

    j.    failing to warn Plaintiff of the risk of harm posed by Davis after Defendant knew or should have known of such risk;

    k.    violation of duties imposed by Restatement (Second) of Agency § 213 and Restatement (Second) of Torts § 317, as adopted in New Jersey;

    l.    failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Davis;

    m.    failing to warn or otherwise make reasonably safe the property which Defendant possessed and/or controlled, leading to the harm of Plaintiff;

    n.    failing to adopt/implement and/or enforce policies and procedures for the reporting to law enforcement, state board of massage therapy and/or other authorities of sexual assaults by massage therapists;

    o.    failing to report sexual assaults by massage therapists, including Davis, to authorities;

    p.    violating its own policies and/or by-laws regarding sexual assaults by staff;

    q.    failing to properly supervise and/or discipline its employees;

    r.    failing to adequately and properly train its employees regarding sexual assaults of female customers by massage therapists; and

    s.    negligently managing and/or operating Massage Envy franchise locations, including Massage Envy Mays Landing.

87.    Defendant Massage Envy, having advertised and promoted itself as having a "zero tolerance" policy relating to sexual misconduct by massage therapists, explicitly and/or implicitly represented to the public in general, and to Plaintiff in particular, that the massage therapists, including Davis, in its employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

88.     Defendant made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female customers making decisions regarding their engagement of massage/spa services.

89.     At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures with respect to the removal and/or supervision of individuals in its employ or service who were suspected of being sexual predators.

90.     Defendant failed to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) sexual predators in its service and employ.

91.     Defendant failed to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in its service and employ.

92.     As a result of the above-described conduct, Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

93.     In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendant, jointly and severally with all other defendants and individually and collectively for damages, interest, cost

of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT III-NEGLIGENCE
## PLAINTIFF v. DEFENDANT, CMGK, LLC d/b/a/ MASSAGE ENVY MAYS LANDING

94.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

95.    Defendant, by and through its agents, servants and employees, knew or reasonably should have known of Davis's dangerous and exploitive propensities and/or that Davis was an unfit agent. It was foreseeable that if Defendant did not adequately exercise or provide the duty of care owed to female customers in their care, including, but not limited to Plaintiff, they would be vulnerable to sexual assaults by Davis.

96.    Defendant owed to the public in general, and to Plaintiff in particular, a duty to reasonably identify, remove, and/or report (to law enforcement authorities and/or to state massage therapy boards) individuals who it knew, or should have known, were sexual predators in its service and employ, including Davis.

97.    Defendant owed to the public in general, and to Plaintiff in particular, a duty to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in its service and employ, including Davis.

98.    Having been in the care of Defendant at the time under circumstances such as to deprive Plaintiff of her entitlement to safe care and protection, Defendant owed to Plaintiff a duty to aid and/or protect her and to control the actions of third parties, as set forth in Restatement (Second) of Torts §§ 314A(4), 315.

99.    Having been in the care of Defendant at the time under circumstances such as to deprive Plaintiff of her normal opportunities for protection, the Defendant owed to Plaintiff a duty to control the acts of its agents, servants, and/or employees.

100.    At all times relevant hereto, Defendant did not have in place (or failed to enforce) adequate, reasonable, and necessary rules, regulations, policies, and procedures which could effectively identify (and deal with) sexual predators.

101.    At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures for the removal of sexual predators in the employ and/or service of Defendant, including Davis.

102.    At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to criminal authorities sexual predators, including Davis, in the employ and/or service of Defendant.

103.    At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures which provided for the reporting to the state board of massage therapy the presence of sexual predators, including Davis, in the employ and/or service of Defendant.

104.    As set forth in this Complaint, Defendant failed to fulfill its legal duty to protect Plaintiff and other female customers from the depraved and vile acts of its massage therapist, Davis.

105.    As set forth in this Complaint, Defendant failed to take the reasonable steps to ensure that massage therapists at Massage Envy Mays Landing were psychologically fit to provide massage therapy services to female customers. These failures included the following:

a.    Failure to investigate the background of massage therapists in its employ or service;

b.    Failure to prohibit, restrict, or limit the activities of massage therapists suspected of sexual assault and/or those known to be sexual predators;

c.    Failure to reasonably and properly investigate allegations of sexual assault;

d.    Failure to properly train and instruct investigators;

e.     Failure to have in place standards of acceptable and unacceptable conduct;

f.     Failure to designate competent investigators to evaluate complaints of sexual assault; and

g.     Failure to have in place standards for reporting acts of sexual misconduct to law enforcement authorities and/or the state board of massage therapy.

106.   Moreover, the negligent, reckless, intentional, outrageous, deliberately and recklessly indifferent and unlawful conduct of Defendant, as set forth above and herein, further consisted of:

a.     permitting Davis to sexually assault female customers, including Plaintiff;

b.     permitting Davis to engage in illegal sexual conduct with female customers, including Plaintiff, on the premises of Massage Envy Mays Landing, during operating hours;

c.     permitting Davis to violate New Jersey criminal statutes New Jersey criminal statutes N.J.S.A. 2C:14-2 and 2C:14-3;

d.     failing to properly and adequately supervise and discipline its employees to prevent the sexual assault that occurred to Plaintiff;

e.     failing to adopt, enforce and/or follow adequate policies and procedures for the protection and reasonable supervision of female customers who engaged the services of Defendant, including Plaintiff and, in the alternative, failing to implement and comply with such procedures which had been adopted;

f.     failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of female customers, including Plaintiff;

g.     creating an environment that facilitated sexual assault by Davis on Plaintiff;

h.     failing to adopt, enforce and/or follow policies and procedures to protect female customers against harmful contact by its massage therapists, including Davis;

i.     breaching the duties imposed by Restatement (Second) of Torts, § 324A, as adopted in New Jersey;

j.     failing to warn Plaintiff of the risk of harm posed by Davis after Defendant knew or should have known of such risk;

k.     violation of duties imposed by Restatement (Second) of Agency § 213 and Restatement (Second) of Torts § 317, as adopted in New Jersey;

l.     failing to warn Plaintiff of the risk of harm that Plaintiff may suffer as a result of contact with Davis;

m.    failing to warn or otherwise make reasonably safe the property which Defendant possessed and/or controlled, leading to the harm of Plaintiff;

n.    failing to adopt/implement and/or enforce policies and procedures for the reporting to law enforcement, the state board of massage therapy and/or other authorities of sexual assaults by massage therapists, including Davis;

o.    failing to report sexual assaults by massage therapists, including Davis, to authorities;

p.    violating its own policies and/or by-laws regarding sexual assaults by staff;

q.    failing to properly supervise and/or discipline its employees;

r.    failing to adequately and properly train its employees regarding sexual assaults of female customers by massage therapists; and

s.    negligently managing and/or operating Massage Envy Mays Landing.

107.    Defendant explicitly and/or implicitly represented to the public in general, and to Plaintiff in particular, that the massage therapists, including Davis, in its employ and service were not only psychologically fit but were therapists who could be entrusted with the safety and well-being of female customers.

108.    Defendant made these explicit and implied representations knowing that they were false and/or having reason to believe that they were false, and with the expectation that they would be relied upon by female customers making decisions regarding their engagement of massage/spa services.

109.    At all times relevant hereto, Defendant did not have in place adequate, reasonable, and necessary rules, regulations, policies, and procedures with respect to the removal and/or supervision of individuals in its employ or service who were suspected of being sexual predators.

110.    Defendant failed to reasonably identify, remove, and/or report (to law enforcement authorities and/or to the state massage therapy board) sexual predators in its service and employ.

111.    Defendant failed to reasonably supervise and/or monitor individuals who it knew, or should have known, were sexual predators in its service and employ.

112.     Defendant negligently, carelessly, and/or intentionally failed to timely and reasonably identify, remove, and/or report (to law enforcement authorities and/or to state boards of massage therapy) Davis as a sexual predator.

113.     As a result of the above-described conduct Plaintiff has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling.

114.     In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendant, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT IV
## NEGLIGENT PERFORMANCE OF UNDERTAKING TO RENDER SERVICES
## PLAINTIFF v. ALL DEFENDANTS

115.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

116.     Defendants undertook, for consideration, the provision of massage therapy services to the Plaintiff pursuant to Restatement (Second) Torts § 323.

117.    Defendants should have recognized as necessary the protection of the Plaintiff's person and physical/mental well-being.

118.    The Plaintiff suffered severe and permanent harm as described above as a result of Defendants' failure to exercise reasonableness in the performance of undertaking to provide massage therapy services to her.

119.    Defendants' failure to exercise such care increased the risk of harm to the Plaintiff and/or the Plaintiff was harmed because of her reliance upon Defendants' undertaking to provide massage therapy services to them.

120.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT V - NEGLIGENCE PER SE
## PLAINTIFF v. ALL DEFENDANTS

121.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

122.    Defendants' involving, permitting, and/or failing to prevent indecent contact between Davis and Plaintiff constitute per se violations of N.J.S.A. 2C:14-2 and/or 2C:14-3.

123.    As a direct result of the aforementioned conduct, Plaintiff suffered severe and permanent harm as described above.

124.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## <u>COUNT VI- NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u><br><u>PLAINTIFF v. ALL DEFENDANTS</u>

125.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

126.    Defendants, by and through their contact with Plaintiff, as described above, negligently and/or recklessly committed multiple acts of extreme and outrageous conduct which caused severe emotional, psychological, and psychiatric injuries, distress, and harm to Plaintiff, which also manifested in physical injuries to Plaintiff as set forth above in an extreme, outrageous and harmful manner.

127.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT VII - NEGLIGENT MISREPRESENTATION
## PLAINTIFF v. ALL DEFENDANTS

128.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

129.    Defendants negligently misrepresented material facts to Plaintiff, namely that was fit to render adequate, competent and appropriate massage therapy services to Plaintiff and that Davis was not dangerous to Plaintiff.

130.    Defendants made these misrepresentations under circumstances and at a time when they knew or should have known of the falsity of these representations.

131.    Defendants made these representations with a reckless disregard for the truth or falsity of such statements and/or with an intent to induce Plaintiff to act on the representations, which, in turn, exposed Plaintiff to harm.

132.    Plaintiff's justifiable reliance on Defendants' misrepresentations resulted directly in injury to Plaintiff as described above and such injuries and damages were legally caused by the justifiable reliance upon Defendants' misrepresentations.

133.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, were negligent for the reasons outlined above and such violations directly and proximately caused Plaintiff's injuries and damages, also outlined above.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT VIII - VIOLATION OF NEW JERSEY CONSUMER

## FRAUD ACT, N.J.S.A. § 56:8-1
## PLAINTIFF v. ALL DEFENDANTS

134.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

135.    Defendants' business acts and practices alleged herein constitute unconscionable commercial practice, and/or deception, and/or fraud, and/or false pretense, and/or false promise, and/or misrepresentation, and/or the knowing concealment, suppression, or omission of material facts under the New Jersey Consumer Fraud Act, § 56:8-1, *et seq.* (hereinafter "NJCFA").

136.    At all relevant times, the New Jersey Plaintiff was a "person" within the meaning of the NJCFA.  N.J.S.A. §§ 56:8-1 and 56:8-2.

137.    Defendants' conduct, as set forth herein, constitutes an "advertisement" or "sale" within the meaning of the of the NJCFA.  N.J.S.A. §§ 56:8-1 and 56:8-2.

138.    The practices of Defendants, described above, violate the NJCFA for, *inter alia,* one or more of the following reasons:

a.    Defendants engaged in unconscionable commercial practices in failing to reveal material facts and information about their knowledge and/or number of incidents and/or allegations of sexual assault or exploitation by massage therapists at Massage Envy franchise locations and/or dangers associated with their massage therapists, which did, or tended to, mislead the New Jersey Plaintiff about facts that could not reasonably be known by the consumer;

b.    Defendants caused New Jersey Plaintiff to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

140.    Defendants' actions impact the public interest because the New Jersey Plaintiff was injured in exactly the same way as thousands of others purchasing massages as a result of and pursuant to Defendants' generalized course of deception.

141.    Had the New Jersey Plaintiff known of the defective nature of Defendants'

business, employees and/or agents, namely, the number of incidents or allegations of sexual assaults or exploitation of Massage Envy customers by Massage Envy massage therapists and/or Massage Envy's policies concerning reporting of same, they would not have purchased massages at Massage Envy.

142.     The foregoing acts, omissions and practices proximately caused New Jersey Plaintiff to suffer actual damages in the form of, *inter alia*, paying for massages where she was sexually assaulted or exploited by Massage Envy a massage therapist, and is entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

143.     In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, engaged in the foregoing acts, omissions and practices and proximately caused New Jersey Plaintiff to suffer actual damages in the form of, *inter alia*, paying for massages where she was sexually assaulted or exploited by a Massage Envy massage therapist, and is entitled to recover such damages, together with all other appropriate damages, attorneys' fees and costs of suit.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## COUNT IX - FRAUDULENT CONCEALMENT
## PLAINTIFF v. ALL DEFENDANTS

144.     Plaintiff incorporates the averments of the preceding paragraphs as if each was set forth herein at length.

145.     As set forth above, Defendants concealed and/or suppressed material facts

concerning the safety of their customers. Defendants knew that employees and/or agents, namely, massage therapists at franchise locations, were sexually assaulting and exploiting customers, but Defendants concealed those material facts. Defendants recklessly assigned these sexual predators masked as massage therapists to consumers in the United States, even though Defendants knew, or should have known, at the time of the scheduling of appointments, that employees and/or agents were sexually assaulting and/or exploiting customers. Plaintiff had no knowledge of these issues at the time that she scheduled/attended her massages at Massage Envy or purchased services at Massage Envy franchise locations.

146.    Defendants made material omissions and/or affirmative misrepresentations regarding the safety of their business, employees and/or agents in massaging customers, including Plaintiff.

147.    Defendants each knew these representations were false when they were made.

148.    Defendants intended for customers, including Plaintiff, to rely on their representations and/or omissions.

149.    Plaintiff, in fact relying on the false representations, purchased massages that were, in fact, defective, unsafe, and unreliable, because Defendants knew their employees and/or agents were sexually assaulting customers yet, concealed this information from the public, including Plaintiff.

150.    Defendants had a duty to disclose these safety issues to Plaintiff, the public, and the New Jersey Board of Massage and Bodywork Therapy, but failed to do so.

151.    Defendants had a duty to disclose the true facts about the safety of its business and customers because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable to Plaintiff. Defendants knew that Plaintiff had no knowledge of Defendants' massage therapists sexually assaulting and exploiting customers  and

dangers within their company that may result in sexual assaults or exploitation by massage therapists, and Plaintiff did not have an equal opportunity to discover the facts to inform her of those defects. Indeed, Plaintiff trusted Defendants not to sell her massage services that were dangerous, criminal, and defective or that violated New Jersey law.

152.    Defendants had a duty to disclose to Plaintiff that the massage services were defective, unsafe, and dangerous because Plaintiff relied on Defendants' representations that Plaintiff would be safe during the massages that she purchased.

153.    The aforementioned concealment was material, because if it had been disclosed, Plaintiff would not have bought massage services at Massage Envy.

154.    The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing massage services. Defendants each knew or recklessly disregarded that their representations and/or statements on the safety of the Plaintiff and general public were false.

155.    By misrepresenting and/or failing to disclose these material facts, Defendants intended to induce Plaintiff to purchase massages at Massage Envy.

156.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, engaged in the foregoing acts, omissions and practices and intended to induce Plaintiff to purchase massages at Massage Envy.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

## <u>COUNT X – CIVIL CONSPIRACY</u>
## <u>PLAINTIFF v. ALL DEFENDANTS</u>

157.    Plaintiff incorporates the averments of the preceding paragraphs as if each was set

forth herein at length.

158.    As outlined above and upon information and belief, Defendants knowingly and willfully conspired and agreed among themselves to misrepresent to and conceal from the public and its customers, including, but not limited to Plaintiff, incidents and allegations of massage therapists sexually assaulting and exploiting customers at franchise locations and/or that there was a danger to all of Defendants' customers that there was a problem of women being sexually assaulted at their Massage Envy franchise locations by its massage therapists. This conspiracy continues to this day.

159.    Defendant Massage Envy, and other defendants named herein, and other Massage Envy franchisees, conspired to keep incidents and allegations of massage therapists sexually assaulting and exploiting customers at franchise locations and/or that there was a danger to customers of being sexually assaulted at its franchise locations by massage therapists from the public and its customers, including, but not limited to Plaintiff. Instead of informing the public, Plaintiff and/or all of Defendants' customers about the number of incidents/allegations of and/or problems of customers being sexually assaulted at its franchise locations by massage therapists, Defendant Massage Envy, and other defendants named herein, and other Massage Envy franchisees intentionally and falsely told Plaintiff and all of Defendants' customers that safety is at the core of their company's mission, that it has a zero tolerance policy towards sexual assaults committed by their massage therapists, that they protect their customers, that they carefully select and thoroughly train their massage therapists, that they are dedicated to providing a comfortable and professional environment, that Plaintiff and all of Defendants' customers can be confident they will have a positive experience, that they bring joy into Plaintiff and all of Defendants' customers' lives, and that they make the best of everybody, among other intentionally false statements to Plaintiff and all of Defendants' customers.

157.    In furtherance of said conspiracy and agreement, Defendants engaged in fraudulent representations, omissions and concealment of facts, acts of cover-up and statements calculated to obtain Plaintiff and all of Defendants' customers as massage customers in their Massage Envy franchise locations for the benefit of Defendants and as set forth in detail in the foregoing paragraphs.

158.    All of the actions of Defendants set forth in the preceding paragraphs were in violation of the rights of Plaintiff and committed in furtherance of the aforementioned conspiracies and agreements. Moreover, each of the aforementioned Defendants lent aid and encouragement and knowingly financed, ratified and adopted the acts of the other. As a proximate result of the wrongful acts herein alleged, Plaintiff has suffered significant damage as outlined above.

159.    These acts constituted malicious conduct which was carried on by said Defendants with willful and conscious disregard for Plaintiff's rights with the intention of willfully concealing incidents of sexual assault and exploitation by Massage Envy therapists on customers and/or the problem of customers being sexually assaulted or exploited at its franchise locations by massage therapists and was despicable conduct that subjected Plaintiff to cruel and unjust hardship so as to justify an award of exemplary and punitive damages. Accordingly, punitive damages should be awarded against Defendants to punish them and deter other such persons from committing such wrongful and malicious acts in the future.

160.    In the alternative, Defendants ABC, Inc. 1-10 (fictitious entities) and/or John Does 1-10 (fictitious persons), through its servants, agents, or employees, engaged in the foregoing acts, omissions and practices and intended to induce Plaintiff to purchase massages at Massage Envy.

WHEREFORE, Plaintiff, Jane Doe M.N., demands judgment against Defendants, jointly and severally with all other defendants and individually and collectively for damages, interest, cost

of suit, punitive damages and such other remedies as this Honorable Court deems equitable, just and proper.

**LAFFEY, BUCCI & KENT, LLP**

BY:_____

        Brian D. Kent, Esquire
        V. Paul Bucci, Esquire
        M. Stewart Ryan, Esquire
        ***Attorneys for Plaintiff, Jane Doe M.N.***

DATED: <u>January 16, 2020</u>

## JURY DEMAND

Plaintiff hereby demand a trial by jury as to all issues.

## DEMAND FOR COMPLIANCE WITH
## N.J. COURT RULES 1:5-1(a) AND 4:17-4(c)

TAKE NOTICE that the undersigned attorney, counsel for Plaintiff, hereby demands, pursuant to the provisions of R.1:5-1(a) and 4:17-4(c), that each party serving pleadings or interrogatories and receiving responses thereto shall serve copies of all such pleadings, interrogatories, and responses thereto upon the undersigned, and further

TAKE NOTICE that this is a continuing demand.

## DESIGNATION OF TRIAL COUNSEL

Brian D. Kent, Esquire is hereby designated trial counsel for Plaintiff, Jane Doe M.N.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to New Jersey Court Rule 4:10-2(b) demand is made that defendant(s) disclose to plaintiff's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment and provide plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary coverage, but also any and all excess, catastrophe and umbrella policies.

## DEMAND FOR ANSWERS TO INTERROGATORIES

Demand is hereby made for fully responsive answers to Form C Interrogatories appearing in Appendix II to the Rules of Court.

## RULE 4:5-1 CERTIFICATION

I, Brian D. Kent, of full age, do certify that I am the attorney for the plaintiff herein and

that to my knowledge there are no other actions or arbitrations pending as a result of the incidents

described in the foregoing Complaint.


                                        **LAFFEY, BUCCI & KENT, LLP**


                              BY:_____
                                        Brian D. Kent, Esquire
                                        V. Paul Bucci, Esquire
                                        M. Stewart Ryan, Esquire
                                        ***Attorneys for Plaintiff, Jane Doe M.N.***



DATED: January 16, 2020

# EXHIBIT  C

 **MENDES**

WWW.MENDES.COM

Katarina Garced
212-261-8441
Katarina.garced@mendes.com

October 23, 2018

**PERSONAL AND CONFIDENTIAL**
**TO BE OPENED BY ADDRESSEE ONLY**

**Via Certified Mail- Return Receipt Requested**
**And Via E-Mail**
CMGK, LLC dba: Massage Envy
278 Consumer Sq.
Mays Landing, NJ 08330

Attn:   Gus Khalifa
        [egk54@yahoo.com]

Re:        **NAS: Specified Medical Professions Professional Liability Coverage**
        Policy No.:          ME100504
        Policy Period:       March 9, 2018 – March 9, 2019
        Insured(s):          CMGK, LLC dba: Massage Envy
        Claimant:            Jane Doe #2 ███████████
        Date of Loss:        September 23, 2017
        Claim Made:          September 4, 2018
        Date Reported:       September 5, 2018
        Retroactive Date:    March 9, 2014
        Our File:            429,756

Mr. Khalifa:

        As you are aware, we are counsel for Certain Underwriters at Lloyd's, London ("Underwriters") providing Specified Medical Professions Claims Made and Reported Professional Liability Insurance under Policy No. ME100504, effective March 9, 2018 to March 9, 2019.  The policy provides Professional Liability Limits of $2,000,000 per Claim, subject to an aggregate limit of $4,000,000 and a $2,500 per Claim deductible.  Pursuant to Endorsement No. 10, the policy also provides Sexual Acts Liability coverage, for Claims involving Sexual Injury, in the amount of $1,000,000 per Claim and $2,000,000

File: 429,756

in the aggregate, subject to a $15,000 deductible per Sexual Injury Claim. Claim Expenses are included within this sublimit of liability.

**Please be advised that Underwriters are disclaiming coverage for the ▆▆▆▆▆▆ ("Jane Doe #2") matter in its entirety under Policy No. ME100504, as CMGK, LLC dba: Massage Envy was aware, prior to policy inception, that Ms. ▆▆▆▆▆ was alleging to have been sexually assaulted by an employee of the Insured on September 23, 2017. Therefore, this Claim falls outside the scope of the policy's Insuring Agreements. In addition, Exclusion A. serves to further bar coverage for this matter, as discussed in further detail below.**

## **Background Information**

### *Report of Inappropriate Conduct*

It is our understanding that on September 25, 2017, ▆▆▆▆▆▆▆, a client of the Insured, reported to your Office Manager, April Pippin, that she had been sexually assaulted during a massage with Steffon Davis, an employee of the Insured, on September 23, 2017. Specifically, she reported that Mr. Davis had touched her vagina and inappropriately exposed her breasts.

### *Therapist Statement*

On September 27, 2017, Mr. Davis presented to the clinic and provided a statement regarding the September 23 session with Ms. ▆▆▆▆. In pertinent part, he advised that they started the massage with Ms. ▆▆▆▆ face-down, but that when she flipped over to face up, her breasts became exposed. Following the statement, the Insured advised Mr. Davis that they would be placing him on a 90-day probation, and that he would have to go over draping with Ms. Pippin. The Insured also advised that, if another complaint was made against him, he would be terminated. Mr. Davis subsequently did not return to work.

### *Criminal Investigation*

On September 28, 2017, Detective C. Clayton of the Mays Landing Police Department presented to the Insured clinic and met with Ms. Pippin regarding a complaint Ms. ▆▆▆▆ had made. Ms. Pippin explained the protocol that the Insured had followed. The Police Department reportedly concluded that there was insufficient evidence to bring criminal charges against Mr. Davis.

### *Suit Filed*

On August 29, 2018, a lawsuit was filed against Massage Envy Mays Landing, MEF, and other entities in the Superior Court of Middlesex County, New Jersey, on behalf of Ms. ▆▆▆▆ (listed in the Complaint as "Jane Doe #2"), along with three other

File: 429,756

women who were allegedly sexually assaulted at three other Massage Envy locations throughout New Jersey, which are also identified in the Complaint. (We note that the other Massage Envy locations involved in this suit are not insured under Policy No. ME100504.)

With regard to Ms. ████, the Complaint alleges she received a massage on September 23, 2017 from Steffon Davis. The Complaint alleges that Mr. Davis brushed his insured erect penis against her body, rubbed against her vaginal area, penetrated her vagina, exposed and massaged her breasts, and choked her while massaging her shoulders. The Complaint further alleges that Ms. ████ "froze and was unable to stop Davis from physically or sexually assaulting her," and left after the massage concluded. The Complaint alleges that, upon information and belief, Mr. Davis has an extensive criminal history, was never properly licensed in the state of New Jersey, and was the subject of a previous complaint made by a female employee in July 2016.

The Complaint contains several causes of action, including: (1) vicarious liability; (2) negligence; (3) negligent performance of undertaking to render services; (4) negligence per se; (5) negligent infliction of emotional distress; (6) negligent misrepresentation; (7) violation of New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1; (8) fraudulent concealment; and (9) civil conspiracy.

Ms. ████ is seeking damages, interest, cost of suit, and punitive damages. The Insured was served with the Complaint on September 4, 2018. NAS was notified of this matter on September 5, 2018.

## Coverage Analysis

**Underwriters are disclaiming coverage for this matter in its entirety pursuant to the Insuring Agreements and other terms and conditions of Policy No. ME100504, on the basis that, prior to the Policy Period, CMGK, LLC dba: Massage Envy had knowledge of a Sexual Act or incident which may result in a Claim. In addition, policy Exclusion A. applies to this matter, as discussed in further detail below.**

*Disclaimer under the Sexual Acts Liability Endorsement*

We note that the Insuring Agreement contained within Policy No. ME100504's Sexual Acts Liability Endorsement (Endorsement No. 10) states:

> ***Sexual Acts Liability:*** *The Company shall pay on behalf of an Insured all sums in excess of the Deductible amount stated in this Endorsement, which the Insured shall become legally obligated to pay as **Damages** as a result of **Claims** first made against the Insured during the **Policy Period** or during the Extended Reporting Period, if exercised, for **Sexual Injury** arising out of any **Sexual Act** perpetrated or alleged to have been perpetrated by*

3

File: 429,756

> the Insured or by any person for whose actions the Insured is *legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured person who perpetrated or is alleged to have perpetrated a **Sexual Act** resulting in **Sexual Injury** provided:*
>
>> A. *such **Sexual Act** arises out of the conduct of the Insured's **Professional Services**; and*
>>
>> B. *such **Sexual Act** is perpetrated or alleged to have been perpetrated during the **Policy Period** or on or after the Retroactive Date stated in Item 7. of the Declarations and before the end of the **Policy Period**; and*
>>
>> C. <u>*prior to the effective date of this policy, the Insured had no knowledge of such **Sexual Act** or any fact, circumstance, situation or incident involving such **Sexual Act** which may result in a **Claim** under this policy; and*</u>
>>
>> D. *the **Claim** is reported to us by an insured in writing during the **Policy Period** or during the Extended Reporting Period, if applicable.* [Underlining added.]

"Sexual Act" is defined in Endorsement No. 10 as:

> *sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of an Insured's **Professional Services***

"Sexual Injury" is defined in Endorsement No. 10 as:

> *bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a **Sexual Act**.*

Based on the above-cited provisions, Policy No. ME100504's Sexual Acts Liability coverage only provides coverage provided that, prior to the effective date of the policy, the Insured had no knowledge of a Sexual Act that may result in a Claim under the policy. CMGK, LLC dba: Massage Envy first received notice of Ms. ████ allegations of inappropriate contact on September 25, 2017. Based on the foregoing, CMGK, LLC had knowledge of the incident giving rise to this Claim prior to inception of the policy on March 9, 2018, and, therefore, this matter falls outside the scope of the policy's Sexual Acts Liability Insuring Agreement. **<u>As such, Underwriters disclaim coverage for this matter in its entirety under Policy No. ME100504, as CMGK, LLC had prior knowledge of the incident giving rise to this Claim.</u>**

File: 429,756

<u>*Applicable Policy Exclusion*</u>

In addition to the foregoing, we direct your attention to the following applicable policy exclusion, which further serves to bar coverage for this matter under Policy No. ME100504:

> ### THE EXCLUSIONS
>
> *This policy does not apply to:*
>
> A.   any **Claim** *based upon or arising out of any dishonest, fraudulent, criminal, malicious or knowingly wrongful acts, errors or omissions intentionally committed by or at the direction of an Insured;*

Pursuant to Exclusion A., Policy No. ME100504 does not provide coverage for Claims based on fraudulent or knowingly wrongful acts intentionally committed by or at the direction of an Insured.  We note that the causes of action asserted within the Complaint for (1) violation of New Jersey Consumer Fraud Act; (2) fraudulent concealment; and (3) civil conspiracy, all contain allegations that the defendants engaged in unlawful, fraudulent, and/or knowingly wrongful acts.  As such, Underwriters further disclaim coverage for any damages arising out of these allegations pursuant to Exclusion A.

### **Concluding Remarks**

We trust you understand the reasons for the positions taken in this letter. Please note that because there is no coverage for this Claim under Policy No. ME100504, we will take no further action in regards to this matter.  If you have not done so already, we recommend reporting this matter under any professional liability policy in effect at the time CMGK, LLC initially received notice of Ms. ■■■■■■ allegations.

Underwriters reserve the right to continue to investigate this matter and to amend and supplement this coverage determination if any additional information becomes available.  The future activities of Mendes & Mount, LLP in connection with this matter shall not be construed as a waiver of any of Underwriters' rights set forth in this correspondence or pursuant to any term or condition of Policy No. ME100504.  We note that this coverage determination is based upon all information received by Underwriters to date.  If you believe our coverage analysis is incorrect, please advise us of your position. If you have any additional information that you would like us to consider, please do not hesitate to contact the undersigned.

Please be advised that you have the right, at your own expense, to hire an attorney to advise you as to the coverage issues raised in this letter or to otherwise advise you as to any of the claims made against you. Should you do so, please feel free to have your attorney contact the undersigned and we will cooperate with any

File: 429,756

reasonable request made by you and/or your counsel.

Please feel free to contact our office should you have any comments or questions.

Very truly yours,

MENDES & MOUNT, LLP

*Katarina Garced*

Katarina Garced

cc:   Via E-Mail
      Sara Von Tersch
      Suzette Toole
      *NFP Property & Casualty Services*

      Jaime Weinberg
      *NAS*

      Michael Fleming
      Lena Carlucci
      *Mendes & Mount*